**William A. EHLERS and William A. Ehlers, Executor of the Estate of Margaret C. Ehlers, Deceased, Plaintiff,**

**v.**

**Richard P. VINAL, District Director of Internal Revenue for the District of Nebraska, Defendant.**

Civ. No. 01484.

United States District Court
D. Nebraska.

March 29, 1966.

Rogers, Field & Gentry and Jack B. Robertson, Kansas City, Mo., and Bur-

bridge & Burbridge, Omaha, Neb., for plaintiff.

John M. Bray, Dept. of Justice, Washington, D. C., and Theodore L. Richling, U. S. Atty., Omaha, Neb., for defendant.

ROBINSON, Chief Judge.

This is an action instituted by William A. Ehlers, on his own behalf and as Executor of the estate of Margaret Ehlers, against Richard P. Vinal, the District Director of Internal Revenue for the District of Nebraska, to recover an alleged overpayment of income taxes, penalties, and interest for the years 1948 through 1958 in the total amount of $122,344.91 plus interest. Hereinafter we shall refer to William A. Ehlers as "Ehlers" or "taxpayer" and shall by those terms refer to William A. Ehlers both in his own right and in his capacity as executor of the estate of his wife.

The Court has jurisdiction pursuant to the provisions of 28 U.S.C.A. § 1340.

The taxpayer is an attorney who has practiced law in Omaha, Nebraska. During the years 1948 to 1958, he became engaged in purchasing property that was subject to a land contract and having the land contract assigned to him. During this period, joint federal income tax returns were filed by Ehlers and his wife. In 1954, the Internal Revenue Service began an investigation of these returns. It was determined that certain items of income had not been reported by taxpayer, and a net worth statement was prepared which indicated a substantial discrepancy between actual income and reported income. As a result of this investigation, additional income taxes were assessed, fraud penalties were added and additional interest was charged. Taxpayer paid these additional amounts for all of the years in question in August of 1961. The present case was filed to recover those payments after timely claim for refunds had been made.

The case was tried to the Court and to a jury, the jury returning a special verdict of wilful failure to report income with intent to defraud the Government against the taxpayer for each of the years in question.

We now have before us for determination the plaintiff's motion for a directed verdict and judgment at the close of all the evidence; plaintiff's motion to set aside the verdict and enter judgment notwithstanding the verdict or in the alternative for a new trial; and the issues which remained for determination by the Court after the trial herein. The latter includes the question of capital gain or ordinary income reporting of discounts from the land contract transactions and that of treating a proportionate part of each payment on the land contracts as income. We shall separately state and discuss each of those items that are before us.

The system used by Ehlers with respect to the land contracts was quite efficient. Generally, the transaction was brought to him by another party rather than his going out in search of a prospective purchase. After being contacted, Ehlers would personally appraise the property involved and run a check on the credit of the people who had signed the land contract. This method resulted in his refusal to accept approximately 75% of the prospective purchases offered to him.

The first issue to be determined is whether taxpayer should account for the profit he earned from discounts on land contracts as capital gains or as ordinary income. Many of the transactions involved the purchase by Ehlers of the property at an amount somewhat lower than the balance remaining on the land contract which would also be assigned to the taxpayer. The taxpayer urges that he was engaged in the purchase of real estate only and that it was incidental to the actual purchase of real estate that the land contract pertaining to that real estate was assigned to him. Since he was engaged in the purchase and sale of real estate, any gain made thereon should naturally be treated as a capital gain.

The Government takes the position that the form of these transactions indicates

that Ehlers was actually financing these land contract transactions—loaning money and receiving the legal equivalent of interest in return. We agree with the Government.

■ Under Nebraska law, the land contract agreements here are considered to be coequal with mortgages. Section 76–251 of the Nebraska Revised Statutes, 1943, provides:

"Deed intended as mortgage; recording; effect. Every deed conveying real estate, which, by any other instrument in writing, shall appear to have been intended only as a security in the nature of a mortgage, though it be an absolute conveyance in terms, shall be considered as a mortgage. The person for whose benefit such deed shall be made shall not derive any advantage from the recording thereof, unless every writing operating as a defeasance, or explaining its effect as a mortgage, or conditional deed, is also recorded therewith and at the same time."

Every one of the pieces of real estate purchased by Ehlers was accompanied by a defeasance instrument which meant that the only interest in land that could be sold was that of a mortgagee. A cursory glance might leave the impression that the transactions here involved were the purchase and sale of real estate, but a closer examination and analysis lead directly to the conclusion that Ehlers was purchasing the rights under the land contract. He was in reality financing the sale between the original buyer and seller.

■ Having determined that Ehlers was not merely purchasing real estate but was purchasing the entire related bundle which basically amounted to the land contract, we must determine the legal effect thereof. The United States Supreme Court gave us the answer to the problem in the case of United States v. Midland-Ross Corp. [1965], 381 U.S. 54, 85 S.Ct. 1308, 14 L.Ed.2d 214, which was decided in the spring of 1965, at about the same time this case was tried. We concede that this case is different on

its facts from *Midland-Ross,* but the theory expounded therein applies equally to the case at bar as it did under the differing factual circumstances. That which serves the same function as stated interest—in other words, compensation for the use or forbearance of money—is ordinary income and not entitled to capital gain treatment. The difference between the price paid by Ehlers and the remaining balance of the land contract is essentially equivalent to a discount. The money to be paid on the land contract, barring the risks which attend any investment, was a sum certain to be paid on a monthly basis. Congress intended capital gains treatment only in those situations normally involving the realization of appreciation in value accrued over a substantial period of time, thus softening the hardship of accepting the entire gain in one year. Commissioner of Internal Revenue v. Gillette Motor Transport Co., 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617. The effective discount which was received here did nothing more than raise the rate of interest which was received by the taxpayer on his investment. This is certainly reportable as ordinary income and we cannot find that taxpayer should have received capital-gains treatment in this respect.

We find that the earned discount received by taxpayer on the land contract transactions here in question should have been reported as ordinary income rather than as capital gains.

The next question to be considered is whether Ehlers should have treated a proportionate part of each payment on the land contracts as income rather than making a total recovery of his costs before reporting income. As we shall point out, the decision of this issue depends on the resolving of a factual question by this Court.

The taxpayer has been following the practice of recovering his entire cost, including miscellaneous additions to purchase price such as taxes, etc., before reporting any income on these transactions. His theory is that the possibility

of a complete recovery on any of these contracts is highly speculative and he therefore has the right to make a complete recovery of his costs before he need report any income. The Government feels that there is no such speculative risk involved with these contracts and that a portion of each monthly payment should be allocated to income with the remainder being assigned to recovery of principal or costs.

■ Courts seem to agree that the test of whether discount income should be reported proportionately with each payment is the certainty of recovery on the contract or that the contract will be carried out. Whatever confusion may have existed in the Ninth Circuit Court of Appeals as a result of Phillips v. Frank [9th Cir., 1961], 295 F.2d 629, was dissolved by the clear statement of the court in Willhoit v. Commissioner of Internal Revenue [9th Cir., 1962], 308 F.2d 259, wherein the above rule was adopted in the following language at page 263 of 308 F.2d:

"＊ ＊ ＊ Thus in Liftin v. Commissioner [of Internal Revenue], 36 T.C. 909 (1961), the Tax Court stated that 'Where a taxpayer acquires at a discount contractual obligations calling for periodic payments of parts of the face amount of principal due, where the taxpayer's cost of such obligations is definitely ascertainable and where there is "no doubt whether the contract[s] [will] be completely carried out" (Hatch v. Commissioner of Internal Revenue [2 Cir.] 190 F.2d 254 at 257), it is proper to allocate such payments, part to be considered as a return of cost and part to be considered as the receipt of discount income; but, conversely, when it is shown that the amount of realizable discount gain is uncertain or that there is "doubt whether the contract [will] be completely carried out" the payments should be considered as a return of cost until the full amount thereon has been recovered and ⸴ no allocation should be made as between such cost and discount income.'

We are in accord with that test. ＊ ＊ ＊"

Significantly, the Court in Willhoit cited the *Phillips* case, supra, recognizing that the facts in the earlier case exhibited a highly speculative investment with some real doubt as to recovery of cost.

In Darby Investment Corporation v. Commissioner of Internal Revenue, [6th Cir., 1963] 315 F.2d 551, the rule is adopted at page 552 of 315 F.2d:

"Determination of the issue turns on the question of whether the investment in the contracts is of such a speculative nature that the purchaser, the petitioner herein, cannot be reasonably certain of ever recovering his cost. Burnet, Commissioner of Internal Revenue v. Logan, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143."

■■ Thus, we must ascertain here whether taxpayer's investments were so speculative that he couldn't have reasonable certainty of recovering his costs. We have concluded that these investments were not speculative to that extent and therefore a proportionate part of the payments should have been assigned to income.

The testimony reveals that Ehlers accepted only about 25% of the contracts that were offered to him. His method of screening the prospective transactions was quite thorough. He would personally inspect the property involved, using his long experience in the City of Omaha in related business to accurately appraise each of the pieces of real estate. Having satisfied himself that the property was worth a sufficient amount of money, he would make a check on the credit probabilities of the purchasers of the real estate who were to be the payors under the land contract. It was not until he had completed this check that he would enter the transaction. Almost every land contract which he acquired was a first lien on the real estate which secured the contract. He never paid more for the encumbered real estate than he felt the property was actually worth on the mar-

ket. This resulted in a purchase price that was sometimes as much as 50% below the remaining balance on the land contract which was then assigned to him.

Under these circumstances, we find that Ehlers ran very little risk of accepting a loss on any of his transactions. He testified that he had the right to reclaim the property without returning prior payments if there were a default by a vendee on one of the land contracts. He also stated that he lost money on only about twelve of the 300 to 400 land contract transactions that he became engaged in.

We would be blinding ourselves to the practical reality of the fact situation here present were we to say that taxpayer could not have been reasonably certain of ever recovering his costs. While we certainly concede that the nature of the property dealt with [mostly in cheaper, run-down neighborhoods] would indicate a degree of uncertainty as to the completion of any one contract by any one vendee, the guards against losing money which were thrown up by the taxpayer more than counterbalance this factor. While recognizing that the properties were of low value, we must equally recognize that Ehlers, by his own testimony, never paid more for these properties than their actual worth.

We find that Ehlers was certain enough of recovering his costs that he should properly have allocated a proportionate part of each payment on the land contracts to income and part to recovery of cost or principal.

Having resolved those issues which had been reserved for decision by the Court, we may now turn to those issues presented by that portion of this case which was presented to the jury.

In the case presented by the Government dealing with the fraud issue, much reliance was placed on the use of the so-called net worth method of rebuilding or establishing the approximate income of the taxpayer for the years in question. Ehlers contends that this type of evidence was incompetent since the record clearly reflects the fact that government agents did not discover any source of income in even one instance which was not shown on taxpayer's books. The contention is that since the net worth method of establishing income is fraught with dangerous pitfalls, it should not be used unless there is some showing that it is necessary—i. e., insufficient or incomplete records, showing of unreported and unrecorded sources of income, etc. Once again we are forced to disagree with taxpayer's analysis of the law.

▮ The net worth method of reproducing income for tax purposes has been recognized by most courts, including the Supreme Court of the United States. Holland v. United States, [1954] 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150; Schroeder v. Commissioner of Internal Revenue, [8th Cir., 1961] 291 F.2d 649; United States v. Massei, [1958] 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517; Clark v. Commissioner of Internal Revenue, [3rd Cir., 1957] 253 F.2d 745; Laughinghouse v. Commissioner of Internal Revenue, [5th Cir., 1956] 227 F.2d 477; Hasson v. Commissioner of Internal Revenue, [6th Cir., 1957] 239 F.2d 778. The question for us to determine is when may it be properly used. We believe the taxpayer's contentions that wherever apparently adequate books are kept the net worth method cannot be used is clearly refuted by the *Holland* and *Schroeder* cases, supra.

In Schroeder, the Eighth Circuit took the following position at page 652 of 291 F.2d:

"It is unnecessary for the Commissioner to show that inadequate books and records have been kept by the taxpayer before resorting to the net worth method of computing taxable income for the years in question. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150."

Ehlers contends that although this quoted passage is certainly explicit as it stands, it cannot be fairly taken out of context. He urges that all of the cases that cite this rule have had some other evidence which indicated that the taxpayer's books did not reflect income or

that there was another source of income. Since that situation does not prevail here, taking the naked statement above quoted out of context is a misinterpretation of the law of that case. We find this contention to be clearly erroneous. In the *Holland* case, supra, under the heading "Use of Net Worth Method Where Books Are Apparently Adequate", the Supreme Court ended its discussion in the following manner at page 132 of 348 U.S.:

" * * * Certainly Congress never intended to make § 41 a set of blinders which prevents the Government from looking beyond the self-serving declarations in a taxpayer's books. 'The United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures * * *. This system can function successfully only if those within and near taxable income keep and render true accounts.' Spies v. United States, 317 U.S. [492] 495 [63 S.Ct. 364, 87 L.Ed 418]. To protect the revenue from those who do not 'render true accounts', the Government must be free to use all legal evidence available to it in determining whether the story told by the taxpayer's books accurately reflects his financial history."

We would be forced to disregard the obvious reality of a substantial discrepancy between actual income and reported income if the net worth method of reconstructing income were not allowed to be used until the books of the taxpayer were proven inadequate. One of the most important and useful tools in the hands of the Government in the enforcement of our revenue laws would be obviated in a great many cases if such were the rule. To say that the Government cannot prove $100,000 of the reconstructed income by net worth in comparison to a $5,000 reported income merely because the taxpayer's books don't reveal the reason for the discrepancy does not make good sense in the eyes of this Court.

Along the same line, Ehlers contends that at the very least some source of this additional income must be indicated before the net worth approach can be used. Without going into a full discussion of this issue, we may say that adequate authority supports the Government's position that all that is required in this respect is a negation of nontaxable sources of income such as gifts, windfalls, money hoards, or the like. United States v. Massei, supra. This was accomplished through questions asked of the taxpayer by counsel for the Government at the trial of this case.

We do not mean to imply by the foregoing that this Court considers the net worth approach to the reconstruction of income to be infallible. The *Holland* case points out at least six potential areas of danger wherein the trial court must be exceptionally aware of the possible unfair results of presenting the approach. But this is a matter for regulation of the use of the method, not for condemning its use in all but a few instances. The net worth approach has been accepted as a valid and fairly accurate means of reconstructing income, but one which places an extra burden of care and watchfulness on the courts to ascertain that the fair and proper use of the method does not evolve into an unfair and oppressive means of terrorizing taxpayers.

In reconstructing taxpayer's income for the years in question, the Government first established a net worth for December 31, 1947 and December 31, 1958, which were taken from the taxpayer's books and have been admitted to be accurate with only minor exceptions not material here. Net worth statements were then prepared for the end of the years 1948, 1949, 1950, 1951, 1952, 1953, and 1954. However, the Government did not present evidence to establish the ending net worth for the years 1955, 1956, and 1957, but spread the difference between the net worth of December 31, 1958 and the net worth of December 31, 1954 over the four years of 1955, 1956, 1957, and 1958, evenly, allocating the same amount to each year. The net worth statements were prepared using both the taxpayer's method of reporting income and capital gain and also using the

method of reporting income which the Government contended was proper.

Since there appears to be no dispute as to the method of preparing the net worth statements and since we find that the evidence adequately supports the accuracy of the method used, we will not take time here for a detailed analysis of the ways and means of preparing the net worth statements. Suffice to say that we are satisfied that the statements are accurate within the limits that can be expected of this less than perfect method of approaching the reconstruction of income.

To simplify the presentation of the net worth statements, we have prepared an illustration of only the results of the reconstruction of income without going into the detailed descriptions shown by those exhibits which were admitted into evidence at the trial of this lawsuit.

| YEARS | * Income Reported By Ehlers | * Income Using Gov't Computations | * Income Allowing For Capital Gains and Cost Recovery Methods Used by Ehlers |
|---|---|---|---|
| 1948 | $ 6,184.88 | $14,678.77 | $ 9,873.52 |
| 1949 | 6,189.91 | 11,585.62 | 9,244.02 |
| 1950 | 8,480.27 | 23,336.98 | 21,220.50 |
| 1951 | 9,509.10 | 20,693.46 | 13,624.18 |
| 1952 | 6,829.15 | 33,195.86 | 28,082.09 |
| 1953 | 11,118.13 | 35,535.60 | 31,137.95 |
| 1954 | 16,790.69 | 30,530.59 | 22,415.76 |
| 1955 | 17,754.42 | 37,577.12 | 31,848.95 |
| 1956 | 18,409.41 | 37,196.22 | 25,768.90 |
| 1957 | 18,222.09 | 39,906.34 | 31,094.32 |
| 1958 | 23,088.85 | 34,358.85 | 37,741.16 |

\* Adjusted Gross Income.

There is no question that unlike the other facets of this case, the burden is upon the Government to show a fraudulent intent to evade taxes and this must be shown by clear and convincing evidence. See Mertens, Law of Federal Income Taxation, Vol. 10, § 55.18. Ehlers contends that the evidence in this case is far from sufficient to establish fraud.

The above table indicates that Ehlers substantially understated his income for each of the years in question. This consistent understatement is evidence in and of itself upon which the trier of fact could determine that fraud was present. "A consistent pattern of under-reporting large amounts of income over a period of years is substantial evidence bearing upon an intent to defraud, particularly where the reason for such understatement is not satisfactorily explained or shown to be due to innocent mistake. Lusk v. Commissioner, 7 Cir., 250 F.2d 591, 594; Schwarzkopf v. Commissioner, 3 Cir., 246 F.2d 731, 734; Kurnick v. Commissioner, 6 Cir., 232 F.2d 678, 681; Hargis v. Godwin, supra [8 Cir., 221 F.2d 486]; Owens v. United States, supra [8 Cir., 197 F.2d 450]." Klassie v. United States, [8th Cir., 1961]

289 F.2d 96. We have no question but that the consistent pattern of failure to report a substantial percentage of income by Ehlers in the instant case was sufficient evidence standing alone to allow the jury to reach the conclusion that it did.

There was, however, further evidence to substantiate the finding of fraud. Testimony was elicited showing a number of occasions that Ehlers had failed to report portions of his income—either by failing to report down payments or by failing to report payments as they came in. He was also shown to have added expense items such as taxes, clearing title, etc., to the cost of the real estate, requiring the purchaser to make full repayment, and at the same time deducting these items as expenses on his income tax returns. These specific items of misreporting tend to give further credence to the jury's finding of fraud.

 Ehlers objects to the Court's instruction that the jury could consider evidence referring to one year as bearing on all of the years in issue. This contention is answered by the very nature of a proceeding in fraud—one which requires proof of intent. Fraud is never presumed, but it obviously may be established by direct or circumstantial evidence. Klassie v. United States, supra. In much the same way as the pattern of understatement develops into substantial evidence referring to each of the years, a showing of a number of related instances in which taxpayer has evaded the tax should apply to each of the years in question to show the disposition present in the taxpayer to underreport portions of his income. We do not believe there was any prejudice involved nor was there an incorrect statement of law in the questioned instruction.

 Ehlers also urges that it was error to instruct the jury concerning any possible failure to cooperate with the revenue agents that was exhibited by Ehlers. Admittedly the evidence of such failure was not strong, but it was sufficient to allow the issue to be submitted to the jury. Furthermore, the instruc-

tion cannot be taken out of context as Ehlers attempts to do. Included with the instruction to which objection is made, and immediately following it, is the suggestion to the other side that should the jury find cooperation, this should be considered in favor of the taxpayer. Thus, not only do we find that the evidence supported the instruction, we also must note that a fair reading thereof in context as it was delivered to the jury shows no prejudice whatsoever to the taxpayer in the eyes of this Court.

 We interpret the observation at this point that the evidence of specific instances of failure to report income that was admitted at the trial would not have been sufficient, standing alone, to establish the willful intent to defraud the Government. But these specific instances, taken together with the substantial understatement of income supported by the net worth statements is certainly enough to allow reasonable minds to conclude that fraud was present herein. We have no question that clear and convincing evidence has been provided to permit the jury to reasonably arrive at its verdict.

Ehlers also strongly urges that the evidence with respect to fraud for the years 1955, 1956, 1957, and 1958 is entirely lacking in probative value and therefore there should be a judgment notwithstanding the verdict at least for those four years. He points out that while the Government prepared a yearly estimation of net worth for the years 1948 through 1954, inclusive, there was no yearly estimation for the last four years mentioned above. In addition, the agent who allegedly worked on the years 1955 through 1958 was not called to the witness stand to testify concerning the findings that he made in his investigations. Taxpayer argues that the inherent dangers which accompany the net worth method look far out of proportion to the value thereof when the Government [a] attempts to spread the increase in net worth indiscriminately over a four year period and [b] the Government fails to produce the

agent who analyzed the taxpayer's books over the years in question.

The argument presented by the taxpayer is persuasive. However, were the factors here present standing alone, we would be forced to find in favor of the Government. The opening net worth of December 31, 1954 and the closing net worth of December 31, 1958 were reasonably accurate within the requirements of the *Holland* case. Similarly, the prior consistent pattern of substantial underreporting of income for seven years would tend to lend credence to the implication of fraud. And it can also be said that the increase in net worth was sufficiently substantial that it could not be overlooked. These arguments would obviously favor the Government.

However, there are additional factors for us to consider herein. For instance, a gap of four years between opening and closing net worth necessarily makes the implication of increased net worth more tenuous and less meaningful. The method is fraught with danger under the best of circumstances and the four year gap is certainly not conducive to its accuracy. Furthermore, the agent who investigated these four years and who was the best witness to discuss these years on behalf of the Government was not called to the stand. This failure to call a material witness can be interpreted in a number of ways, but we feel constrained under the circumstances to construe this negative happening in favor of the taxpayer and against the Government. We are certainly justified in so finding.

But there is yet an even more important factor present in this case which occurs to this Court. As we pointed out above, a penalty for fraud has been imposed on the taxpayer by the Government. The burden of proving fraud is on the Government and the proof thereof must be clear and convincing. The statute which provides the penalty for fraud is 26 U.S.C.A. § 6653 and reads in pertinent part as follows:

"§ 6653. Failure to pay tax

\* \* \* \* \* \*

(b) Fraud—If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a)."

As a result of this statute, the fraud penalty is based on the total deficiency as long as any part thereof is based on fraud. Tomlinson v. Lefkowitz, [5th Cir. 1964] 334 F.2d 262. We have in the present case, a substantial understatement of income which resulted from the legal questions of capital gain and cost recovery discussed earlier. These legal questions, although resolved against the taxpayer, certainly did not indicate or infer by any means fraud on the part of the taxpayer. Yet a substantial portion of any fraud penalty will be based on the understatements resulting from these misconceptions of the law.

The penalty statute is a harsh one and should be strictly construed. When there are additional factors which result in unreported income such as we find here, we believe that the Government should at least make the attempt to establish fraud in each year. The four year gap over which the increase in net worth has been evenly spread leaves entirely too much room for speculation, especially when one considers that the understatements not related to fraud but to honest mistakes will be so substantially affected by the penalty.

We cannot ignore the potential injustice that can be found by the failure to establish an unreported increase in net worth in any one of these four years, although the total increase in net worth is significant. We require a more convincing showing by the Government under these circumstances. It may be that the entire increase in net worth occurred in three of the years, yet under the Government "spreading" theory, the mistaken theory understatements would be penalized in the fourth year as well as the three years in which the increase [using Ehlers' methods of capital gain

and cost recovery] in net worth had occurred. We will not ignore this potential injustice and must therefore sustain the motion for judgment notwithstanding the verdict for the years 1955, 1956, 1957, and 1958 with respect to fraud.

We might at this time once again note the writer's feeling that had he been the trier of fact herein, his finding would probably have been that no fraud had been committed. This of course is not the test by which we have examined the present issues. We have found that there was sufficient evidence in the record to allow reasonable minds to reach the conclusion that Ehlers was guilty of fraud. This being the case, the finding by the jury was entirely permissible, although the writer and possibly another jury might have reached a different result.

To the extent that we have not considered any of the points raised by the taxpayer in the motion for directed verdict and in the motion for judgment notwithstanding the verdict, suffice to say we find little or no merit therein and find no reason for further discussion in that regard.

In conclusion, we have found that the earned discount on the land contract transactions should properly be reported as ordinary income; that a proportionate share of the payments on the land contracts should be reported as ordinary income when received; that the verdict of the jury should be allowed to stand with respect to fraud in the years 1948, 1949, 1950, 1951, 1952, 1953, and 1954; and that judgment notwithstanding the verdict should be entered with respect to the issue of fraud for the years 1955, 1956, 1957, and 1958.

The foregoing shall constitute findings of fact and conclusions of law in accordance with Rule 52[a] of the Federal Rules of Civil Procedure. Realizing that there are mathematical computations to be completed before judgment can be entered, counsel for both parties shall agree upon the final amounts to be paid, and counsel for the defendant will prepare and submit an appropriate order of judgment to that effect within thirty [30] days.

It is hereby ordered that plaintiff's motion for a directed verdict should be and it hereby is overruled.

It is further ordered that the plaintiff's motion for judgment notwithstanding the verdict with respect to the years 1955, 1956, 1957, and 1958 should be and it hereby is sustained.

It is further ordered that plaintiff's motion for judgment notwithstanding the verdict and in the alternative for a new trial with respect to the years 1948, 1949, 1950, 1951, 1952, 1953, and 1954 should be and it hereby is overruled.