William A. EHLERS and William A. Ehlers, Executor of the Estate of Margaret C. Ehlers, Deceased, Appellant,

v.

Richard P. VINAL, District Director of Internal Revenue for the District of Nebraska, Appellee.

No. 18578.

United States Court of Appeals
Eighth Circuit.

Aug. 15, 1967.

Rehearing Denied Sept. 8, 1967.

Walter H. Cropper, Omaha, Neb., for appellant, J. Patrick Thornton and William A. Ehlers, Omaha, Neb., with him on brief.

Donald A. Statland, Atty., Dept. of Justice, Washington, D. C., for petitioner, Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson and David O. Walter, Attys., Dept. of Justice, and Theodore L. Richling, U. S. Atty., Omaha, Neb., with him on brief.

Before VAN OOSTERHOUT, MATTHES and LAY, Circuit Judges.

LAY, Circuit Judge.

Taxpayer instituted this action against the District Director of Internal Revenue for the District of Nebraska to recover an alleged overpayment of income taxes, penalties and interest for the years 1948 through 1958, in the total amount of $122,344.91 plus interest.[1]

The taxpayer, appellant in this court, is an attorney. This litigation arises from his purchase of various properties in and about Omaha, Nebraska, which were subject to land contracts. At the

---

1. The action was brought by William A. Ehlers on his own behalf and as Executor of the Estate of Margaret Ehlers, his deceased wife.

time of the purchase, he would receive from the vendor a blank deed, an abstract of title, an insurance policy on the land, and an assignment of the land contract formerly executed between the vendor and the vendee. Over the period from 1948 to 1958, he was involved in 300 to 400 such transactions. At issue are the tax consequences of these purchases. A more complete statement of the pertinent facts is set forth in the lower court opinion by the Honorable Richard E. Robinson, Chief Judge. 253 F.Supp. 58 (D. Neb.1966).

The taxpayer reported the income received over the purchase price of the land contract as a capital gain rather than ordinary income. Except for a proration which he allowed for the interest received, the taxpayer did not report his income from payments on the land contracts at the time it was received, but waited until the year when he had totally recovered his cost before reporting any gain. The government assessed deficiencies on the premise that the gain should have been reported as ordinary income and should not have been deferred. Taxpayer paid the tax deficiencies, penalties and interest assessed for the eleven years in question. In August 1961 he brought this action in the District Court to recover his alleged overpayment.

The case was submitted to a jury for determination of the issue of fraud for the taxable years 1948 to 1958. The court reserved for its own decision the remaining questions of law and fact involved.[2]

The trial court found generally against the taxpayer as to the deficiencies involved; it held that the income received under the land contract transactions was ordinary income and could not be treated as a capital gain under §§ 1212 and 1221 of the Internal Revenue Code of 1954; that the recovery of the costs was not speculative and appellant should have reported his income proportionately at the time that it was received; and that the government was justified in employing the net worth system to determine taxpayer's income during the period in question. The jury determined that the taxpayer was guilty of fraud for each of the eleven years. The trial court, however, sustained taxpayer's motion for judgment notwithstanding the verdict on the issue of fraud for the years 1955 through 1958, because of an improper application of the net worth method to those years.[3] Appellant was therefore granted refund only as to the fraud penalty from 1955 through 1958. Taxpayer appeals. We affirm.

The parties are in basic agreement as to the issues presented on this appeal. They are as follows:

1. Whether the amount received by taxpayer above costs on land contract transactions should have been reported as ordinary income rather than as capital gain.

2. Whether taxpayer should have allocated a proportionate part of each payment on the land contracts to income and a part to recovery of cost in the year received.

3. Whether the Internal Revenue Service should have been permitted to use the net worth method of reconstructing taxpayer's income.[4]

4. Whether the District Court erred in submitting the issue of fraud to the jury.

2. There is no contention on appeal that the court erred in removing from the jury the factual questions decided within his written opinion.

3. The government, lacking net worth figures for the years 1955, 1956, and 1957, subtracted the 1954 net worth from that for 1958, and then arbitrarily spread the difference, in equal parts, over the four-year period. Cf. Holland v. United States, 348 U.S. 121, at 129, 75 S.Ct. 127, 99 L.Ed. 150 (1954).

4. Appellee limits appellant's attack on the net worth system to the fraud charges. We have broadened the issue in light of appellant's original brief, but, as our discussion demonstrates, it does not change the result reached.

■■ Appellant claims that the property he held by his land contract transactions meets the definition of a capital asset in Tit. 26 U.S.C.A. § 1221. Argument is made that he was purchasing an interest in real estate, holding it for six months or more as an investment and that therefore his income on the transaction should be entitled to "capital gains treatment." Overlooked is the doctrine of equitable conversion applicable in Nebraska. In Buford v. Dahlke, 158 Neb. 39, 62 N.W.2d 252, at 254–255, it was stated:

> "It has been frequently and consistently decided by this court, as it is quite unanimously agreed by courts generally, that if the owner of real estate enters into a contract of sale whereby the purchaser agrees to buy and the owner agrees to sell it and the vendor retains the legal title until the purchase money or some part of it is paid, the ownership of the real estate as such passes to and vests in the purchaser, and that from the date of the contract the vendor holds the legal title as security for a debt as trustee for the purchaser. The interest or estate acquired by the vendee is land and the rights conferred by the contract upon and vested in the vendor are personal property."

Under Nebraska law it is clear that all the vendor of a land contract could transfer to a third person—the taxpayer in this instance—was personal property. The legal title retained by the vendor is merely a form of security. See also In re Wiley's Estate, 150 Neb. 898, 36 N.W. 2d 483, opinion supplemented on other grounds, 151 Neb. 633, 38 N.W.2d 434; United States v. Sode, 93 F.Supp. 398 (D. Neb.1950).

In Arthur E. Wood, 25 T.C. 468 (1955), the Tax Court was faced with the same type of transaction. The court acknowledged the doctrine of equitable conversion under the law of Michigan. As to the assignee of the land contract who claimed a long term capital gain, the court said:

> "The profits derived by petitioner from such contracts were realized simply by holding the contracts until maturity, meanwhile collecting the periodic payments from the purchaser of the property. Petitioner merely collected the proceeds of assigned claims. * * * It is well settled that gain resulting from the collection of a *claim or chose in action* is taxable as ordinary income. * * * Petitioner appears to be in the same economic position *as a bondholder who realizes gain from the recovery of discount on bonds purchased for less than their face amount.*" 25 T.C. at 476–477. (Emphasis ours)

See also Darby Investment Corp., 37 T.C. 839, 843 (1962), aff'd 315 F.2d 551 (6 Cir. 1963), wherein the parties conceded in a similar transaction that the "discount income" received was ordinary income, not capital gain. Compare United States v. Midland-Ross Corp., 381 U.S. 54, 85 S.Ct. 1308, 14 L.Ed.2d 214 (1965). We therefore conclude that taxpayer was not entitled to a refund based upon a capital gain computation.

■ Appellant's second contention is that the gain, whether treated as a capital gain or as ordinary income, is not realized until the taxpayer has completely recovered his cost, relying upon Burnet v. Logan, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143 (1931). The identical argument was offered and rejected in Darby Investment Corp., supra. The court in *Darby* submits that:

> "Determination of the issue turns on the question of whether the investment in the contracts is of such a speculative nature that the purchaser, the petitioner herein, cannot be reasonably certain of ever recovering his cost." 315 F.2d at 552.

This test was properly recognized by the trial court below. The court found under the evidence that these investments were not speculative and therefore a proportionate part of the payments should have been assigned to income.

The evidence demonstrates that while there was some degree of uncertainty

whether any one vendee would complete payments on his contract, the numerous and substantial safeguards against loss erected by Ehlers more than counterbalanced this factor. The evidence showed taxpayer systematically screened the contracts offered him, accepting only around 25 per cent, inspected and appraised the property involved for actual market value, checked the credit of the purchasers who would become his payors, obtained in almost all cases a first lien on the property, and never paid more than what he believed to be the actual market value of the property (sometimes only 50 per cent of the remaining balance on the contract). Due to these factors, along with the provision that in event of default he had the right to foreclose and claim the property without returning prior payments, Ehlers sustained losses on only about twelve of his 300 to 400 land contract transactions.

There exists substantial evidence which supports the findings of the District Court. See Fed.R.Civ.P. 52(a). We sustain the lower court's finding that the taxpayer should have allocated a portion of each payment on the land contracts to income for the year in which it was received.[5]

▇▇▇ Appellant complains of the use of the net worth method for determining the extent of his deficiencies and alleged fraud for the years 1948 through 1958. First, it is argued before the net worth system can be used to reconstruct income the government must show either that taxpayer failed to have any bookkeeping system or that an inadequate method was employed. The fallacy of this argument was fully demonstrated by the trial court,[6] relying upon Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954). The observation of the Court of Appeals for the Seventh Circuit is appropriate here:

"The fact that the taxpayer's books and other records are consistent with his income tax returns or are internally consistent proves nothing more than that they are consistent; it does not establish that they are truthful or accurate. * * * The *Holland* decision makes it clear that there are no conditions precedent to the utilization of the net worth technique." Davis v. Commissioner of Internal Revenue, 239 F.2d 187, at 189 (7 Cir. 1956).

Secondly, appellant contends that the government must indicate a likely source for the additional income before the net worth computations can be used. This position is not tenable in light of the specific holding in United States v. Massei, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958). As the lower court indicated, "all that is required in this respect is a negation of nontaxable sources of in-

---

5. Appellant relies upon the cases of Willhoit v. *Commissioner of Internal Revenue*, 308 F.2d 259 (9 Cir. 1962), Morton Liftin, 36 T.C. 909 (1961), aff'd 317 F.2d 234 (4 Cir. 1963), and Phillips v. Frank, 295 F.2d 629 (9 Cir. 1961) for his contention that such transactions are necessarily uncertain and therefore cost may be totally recovered before income is reported. However, an examination of the facts in those cases discloses that the risks and uncertainties involved in each of them were far greater than those determined by the trial court in the present case.

6. With pragmatic reasoning, the able Chief Judge replied:
"We would be forced to disregard the obvious reality of a substantial discrepancy between actual income and reported income if the net worth method of reconstructing income were not allowed to be used until the books of the taxpayer were proven inadequate. One of the most important and useful tools in the hands of the Government in the enforcement of our revenue laws would be obviated in a great many cases if such were the rule. To say the Government cannot prove $100,000 of the reconstructed income by net worth in comparison to a $5,000 reported income merely because the taxpayer's books don't reveal the reason for the discrepancy does not make good sense in the eyes of this Court." 253 F.Supp. at 64.

come such as gifts, windfalls, money hoards, or the like." See also Commissioner of Internal Revenue v. Thomas, 261 F.2d 643 (1 Cir. 1958); Ferris v. Commissioner of Internal Revenue, 317 F.2d 333, 334 (2 Cir. 1963); Gatling v. Commissioner of Internal Revenue, 286 F.2d 139, 144–145 (4 Cir. 1961). The evidence clearly supports this negation. See also Albert N. Shahadi, 29 T.C. 1157 (1958), holding it is sufficient if the government negates as possible sources of unreported increases in net worth all those nontaxable sources indicated by taxpayer.

■ There are many weaknesses in the utilization of the net worth method to reconstruct a taxpayer's income. It is frequently recognized that potential error can arise. See e. g., Holland v. United States, supra, 348 U.S. at 127–129, 75 S.Ct. 131–132; Schwab, The Civil Aspects of the Net Worth Method, 3 Wm. & Mary L.Rev. 65 at 97 (1961). However, these possible abuses open vistas of rebuttal evidence to the taxpayer in an adversary proceeding. Proof of other sources of income, such as income from nontaxable securities,[7] possible appreciation of property values over a period of years, and possible inaccuracies in the calculations of the net worth (see Friedberg v. United States, 348 U.S. 142, 75 S.Ct. 138, 99 L.Ed. 188 (1954)) are all available as avenues of evidential proof by the taxpayer. None of these explanations appear of record.[8] In fact, to the contrary, appellant agreed to the general

accuracy of the opening and closing net worth statements, personally negated other means of income, offered no explanation of his increased net worth[9] and in no way suggested the increase arose from nontaxable income or appreciation of value. And, despite appellant's counsel's claim that the beginning net worth figure is not accurate, slighted is the fact that appellant's trial counsel basically stipulated to the same in pretrial proceedings. The applicable rule is that parties are bound by stipulations voluntarily made and that relief from such stipulations after judgment is warranted only under exceptional circumstances. See Farmers Co-operative Elevator Assoc., etc. v. Strand, 382 F.2d 224, decided July 25, (8 Cir. 1967).

Of significance is Chief Judge Robinson's statements:

"*Since there appears to be no dispute* as to the method of preparing the net worth statements and since we find that the evidence adequately supports the accuracy of the method used, we will not take time here for a detailed analysis of the ways and means of preparing the net worth statements. Suffice to say that we are satisfied that the statements are accurate within the limits that can be expected of this less than perfect method of approaching the reconstruction of income." 253 F.Supp. at 65. (Emphasis ours)

■ However, because of the arbitrary allocation of the net worth for

7. Taxpayer acknowledges the possession of nontaxable securities in the sum of $136,575.24 in 1958. No evidence is shown as to the date of acquisition or as to what interest may have been received therefrom.

8. In *Holland,* supra, a criminal prosecution for tax fraud, Justice Clark noted that the government may not "disregard explanations of the defendant reasonably susceptible of being checked. But where relevant leads are not forthcoming, the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant. * * * Once the Government has established its case, the

defendant remains quiet at his peril." 348 U.S. at 138–139, 75 S.Ct. at 137.

9. The discrepancy in adjusted gross income as reported by the taxpayer and as computed by the government was in 1955, $19,822.70; in 1956, $18,786.81; in 1957, $21,684.25; and in 1958, $11,270.05. Even when the taxpayer is allowed both the deferment method of reporting and the capital gain deduction claimed on his tax returns, the discrepancy between his reported adjusted gross income and that computed by the government amounts in 1955 to $14,094.53; in 1956, $7,359.49; in 1957, $12,872.23; and in 1958, $14,-652.31.

the years 1955 to 1958, taxpayer's counsel moved for a directed verdict, not only for the failure of the government to prove fraud, but for the recovery of all assessments for those years as well. The trial court again showed perceptive analysis [10] when he sustained the motion for judgment n. o. v. *on the fraud* counts for the years 1955 to 1958. It is, however, apparent that Chief Judge Robinson's critique of the "spreading theory" as it relates to the fraud charge is in part, at least, equally applicable to the assessment of the deficiencies for the years 1955 through 1958.[11] Assuming that the deficiencies were arbitrarily determined by improper allocation, and that this might be sufficient showing to sustain a taxpayer's burden of proof before the tax court,[12] we face a different problem here. Appellant has a distinctly different and greater burden in a tax refund case, since he has assumed the additional responsibility of proving what the cor-

10. Chief Judge Robinson said:
"* * * a gap of four years between opening and closing net worth necessarily makes the implication of increased net worth more tenuous and less meaningful. The method is fraught with danger under the best of circumstances and the four year gap is certainly not conducive to its accuracy. Futhermore, the agent who investigated these four years and who was the best witness to discuss these years on behalf of the Government was not called to the stand. This failure to call a material witness can be interpreted in a number of ways, but we feel constrained under the circumstances to construe this negative happening in favor of the taxpayer and against the Government. We are certainly justified in so finding.
* * *
"The penalty statute is a harsh one and should be strictly construed. When there are additional factors which result in unreported income such as we find here, we believe that the Government should at least make the attempt to establish fraud in each year. The four year gap over which the increase in net worth has been evenly spread leaves entirely too much room for speculation, especially when one considers that the understatements not related to fraud but to honest mistakes will be so substantially affected by the penalty.
"We cannot ignore the potential injustice that can be found by the failure to establish an unreported increase in net worth in any one of these four years, although the total increase in net worth is significant. We require a a more convincing showing by the Government under these circumstances. It may be that the entire increase in net worth occurred in three of the years, yet under the Government 'spreading' theory, the mistaken theory understate-

ments would be penalized in the fourth year as well as the three years in which the increase [using Ehlers' methods of capital gain and cost recovery] in net worth had occurred. We will not ignore this potential injustice and must therefore sustain the motion for judgment notwithstanding the verdict for the years 1955, 1956, 1957, and 1958 with respect to fraud." 253 F.Supp. at 67–68.

11. In civil cases, the government, in determining deficiencies, is presumed to be correct. Banks v. Commissioner of Internal Revenue, 322 F.2d 530 (8 Cir. 1963). But in fraud cases the government has the burden of proof as to fraudulent intent since fraud is never presumed and must be proven by clear and convincing evidence. See Holland v. United States, 348 U.S. at 126, 75 S.Ct. 127. See also 42 Marq.L.Rev. 91 (1958). However, even in civil cases, once the deficiency is shown to be arbitrary, the presumption of correctness disappears. Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); Thomas v. Commissioner of Internal Revenue, 223 F.2d 83 (6th Cir. 1955); Fuller v. Commissioner of Internal Revenue, 313 F.2d 73 (6 Cir. 1963).

12. The arbitrary yearly allocation in a tax deficiency suit tried before the tax court could present serious problems, i. e., the complete disregard of the principle that each year is a separate taxable unit. See Int.Rev.Code of 1954, § 1. See also W. A. Shaw, 27 T.C. 561 at 570 (1956), aff'd 252 F.2d 681 (6 Cir. 1958). See Thomas v. Commissioner of Internal Revenue, 223 F.2d 83 (6 Cir. 1955) [where the Court of Appeals remanded to the tax court to receive additional evidence for the intervening years to which arbitrary allocation of increased net worth had been made]. Compare Thomas W. Banks, ¶61,237 P-H Tax Ct.Mem. (1961), modified 322 F.2d 530 (8 Cir. 1963).

rect tax should be so that the exact amount of refund can be determined. Helvering v. Taylor, 293 U.S. 507, at 514–515, 55 S.Ct. 287, 79 L.Ed. 623 (1935); United States v. Pfister, 205 F.2d 538 (8 Cir. 1953). A tax refund suit is similar to an action for "money had and received" and the burden is always on the taxpayer to show the exact amount the government is wrongfully holding. In a deficiency suit in the tax court, a judgment against the taxpayer would necessarily reflect the court's acceptance of the government's "spreading" of a net worth increase over the individual years involved. But in a tax refund case before the district court, denial of relief to the taxpayer rests on the failure of proof of the exact refund due or alternatively upon the rejection of the credibility of such proof.

▇▇ Where appellant does not specifically challenge upon appeal the findings of the court in denying refund for the years 1955 through 1958,[13] short of plain error, we will not entertain points of law that neither side has urged or briefed. Smith v. American Guild of Variety Artists, 368 F.2d 511, at 514 (8 Cir. 1966). See also Eighth Circuit Rule 11 (b).

▇▇ Lastly, appellant complains of the court's instruction on fraud. Exception was specifically made to the instruction that if any uncooperativeness of taxpayer in supplying information to the revenue agents should be found, this is a circumstance which the jury should consider in determining whether or not there was fraud. A companion instruction was given that should the jury find the Ehlers had been fully cooperative, this should be considered in favor of the taxpayer. We find no merit in taxpayer's objection. The instructions must be construed as a whole.

▇▇ Chief Judge Robinson correctly instructed the jury as to the meaning of fraud in income tax law in the following instruction:

"'Fraud' as used in the income tax statutes, means an actual and deliberate, or wilful, wrongdoing with specific intent to evade a tax believed to be owed."

Appellant's contention that the court "did not restate the law to the jury" is wholly without basis in fact or law. See also Fed.R.Civ.P. 51 as to making specific exception.

▇▇ Finally, appellant argues that there was no evidence of a "scheme or pattern of wrongdoing or a specific purpose to avoid a tax known to be owing," and that "there is no real circumstantial evidence that he possessed the required intent which is necessary for the Court to instruct a jury on the fraud issue." The record clearly demonstrates, in addition to evidence of a consistent pattern of under-reporting income over a period of years, frequent failures to report both down payments and installment payments on the land contracts as they came in, and the addition of expense items, e. g., taxes

13. Assuming taxpayer made out a prima facie proof of refund based upon his accountant's testimony of corrected taxable income (deleting capital gain treatment), the lower court may have determined that despite the arbitrary allocation of tax for the years 1955–1958, the probative effect of the unexplained increase in net worth from 1955–1958 still offsets the credibility of appellant's proof. The court in denying taxpayer recovery made no specific findings in this regard, and his failure to do so is not raised by appellant upon appeal. As to the deficiency refund for 1955–1958, the court found against the taxpayer either as a matter of law or as a matter of fact. Under ei-

ther basis we need not remand for further findings. There exists sufficient evidence in the record to support a factual finding for the appellee when weighing appellant's evidence of exact refund due against the unexplained increase of net worth for the years in question. Cf. Banks v. Commissioner of Internal Revenue, supra, 322 F.2d at 537, wherein we said: "the emphasis is on credibility." And assuming the court was holding as a matter of law that appellee failed to make out a prima facie case for a refund there is no complaint lodged upon this appeal that the evidence was sufficient to make out a prima facie case for the trier of fact to consider.

and insurance, to the cost of the purchase price, requiring the purchaser to make full repayment and at the same time deducting these items as expenses on his income tax returns. It may be noted that the taxpayer also failed to report correctly some of the interest income derived from his land contracts. We feel the trial court properly submitted the issue of fraud to the jury.

The judgment of the lower court is affirmed.