ARTHUR E. WOOD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ARTHUR E. WOOD AND MARY L. WOOD, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 51985, 51986. Filed December 14, 1955.

*Lyall F. Martz, Esq.*, for the petitioners.
*Peter K. Nevitt, Esq.*, for the respondent.

OPINION.

WITHEY, *Judge:*

*Issue 1.*

Respondent determined that gains realized by petitioner from real estate transactions during 1950 and 1951 are taxable as ordinary

income on the ground that the property sold during those years was held by him primarily for sale to customers in the ordinary course of his trade or business. Petitioner contends that such income is properly taxable as long-term capital gains. The question presented is whether at the time of sale petitioner held each parcel of real estate "primarily for sale to customers in the ordinary course of his trade or business" within the meaning of section 117 (a) (1) and (j) (1) of the Internal Revenue Code of 1939.[1] Petitioner's principal argument is that, since he refused to advertise or to employ a sales agent and since each sale made by him was unsolicited, he was simply a passive investor liquidating investment property to his best advantage, and at no time was engaged in the real estate business.

While resolution of the issue here presented involves essentially a factual determination, the courts, in considering this question, have pointed out the most important factors to be utilized in determining whether property at the time of sale was held primarily for sale to customers in the ordinary course of business. The considerations to be given the most weight in such cases include the original purpose of the taxpayer in acquiring the property, the purpose for which it is held at the time of sale, the frequency, continuity and substantiality of sales, and the extent of sales activity on the part of the seller or his agents by improving the property, advertising and soliciting purchasers. *Dunlap* v. *Oldham Lumber Co.*, 178 F. 2d 781; *W. T. Thrift, Sr.*, 15 T. C. 366.

Beginning in the mid-1930's and continuing through 1949, petitioner purchased a great many parcels of real estate which he thereafter held until a demand for real estate created a favorable market and made disposition profitable. Petitioner was engaged in selling these lots from 1940 through 1951. Petitioner stated that his purpose in purchasing the lots acquired, beginning in 1934, was to hold them as an investment with the hope that eventually they would become salable.

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.
 (a) DEFINITIONS.—As used in this chapter—
 (1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
 (A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
 * * * * *
 (j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—
 (1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *

We recognize that the purpose for which property initially is acquired and held is not the determinative factor, since that purpose may change prior to the time of disposition. *Differential Steel Car Co.*, 16 T. C. 413; *Carl Marks & Co.*, 12 T. C. 1196.

A careful review of the evidence discloses nothing which would indicate a change in petitioner's original purpose eventually to dispose of the lots acquired. Inasmuch as only 6 of the total number of nearly 800 lots held by petitioner were capable of producing current income, petitioner does not contend that those lots ever were held for the purpose of realizing investment income. Petitioner held the lots he had purchased until their market value had increased sufficiently to yield a substantial profit upon disposition. Thus, petitioner's later activities appear to be thoroughly consistent with his stated purpose. Accordingly, we are satisfied from the record that, during 1950 and 1951, at the time the lots in question were sold, petitioner's definite intention was to hold them for sale to customers, rather than merely to liquidate an investment.

During the 10-year period commencing in 1940 and continuing through 1949, petitioner sold a total of 285 vacant lots in 90 separate transactions. In 1950 petitioner acquired 23 lots and sold 212 involving 19 separate sales transactions. While the record does not show the number of lots, if any, that were purchased in 1951, petitioner in that year sold 89 lots in 15 sales transactions. At present, petitioner has only 2 lots on hand, both of which he received from the estate of his wife.

Petitioner's ability to sell so large a number of lots without solicitation was due primarily to the demand for real estate in the general area in which most of petitioner's lots were located. The demand for property in Oakland County, Michigan, began during World War II and increased sharply thereafter. In situations such as this, where the market is favorable to the seller, it is not essential that active sales promotion be demonstrated in order to prove that he is engaged in the business of selling real estate. *Mauldin* v. *Commissioner*, 195 F. 2d 714, affirming 16 T. C. 698.

In addition to the sales of vacant lots described above, during the period 1940–1946 petitioner sold 26 pieces of rental property, title to which he had acquired through foreclosure of land contracts previously purchased.

The fact that petitioner's real estate activities were so extensive as to necessitate the maintenance of an office in his home to facilitate the record keeping and document preparation involved in purchasing and selling lots lends further support to the position taken by the respondent that the sales activities of petitioner had in fact acquired the character of a business. A supply of Federal excise stamps was main-

tained at the office for the convenience of purchasers. Moreover, during the 2 years in issue petitioner employed his nephew, Walter S. Wood, on a full-time basis to keep the books and records relating to the purchase and sale of lots and land contracts, prepare deeds for purchasers, accept payments, take telephone calls, and to refer prospective buyers of lots to petitioner. Wood, after having worked for petitioner in the above-described capacity for nearly 10 years, obtained a real estate broker's license in 1954. He is presently employed by petitioner in the capacity outlined above.

Petitioner's stated intention ultimately to dispose of his property, together with his continuous activities in the purchase and sale of lots over a period of several years, the maintenance of an office in his home to facilitate the handling of real estate transactions and the employment of a full-time office assistant to supervise and expedite such matters compel us to conclude that during the years in issue he had established himself in the business of selling real estate and that the parcels of realty sold during those years were, at the time of sale, held primarily for sale to customers in the ordinary course of that business. The applicable principle has been aptly stated in *Curtis Co.*, 23 T. C. 740, at page 755:

However, the essential fact seems to be that these properties were acquired for the purpose of resale whenever a satisfactory profit could be made. Petitioner may not have aggressively promoted the sale of these properties; but, nevertheless, the frequency and volume of its sales of undeveloped real estate and its substantial holdings of such properties convince us that these properties were held, not only for sale at some time in the future, but primarily for sale to its customers in the ordinary course of its business during each of the years here in issue. Petitioner was a dealer in undeveloped land, and gains derived from the sale of such property are taxable as ordinary income.

Having found that petitioner held the property in question for sale to customers in the ordinary course of his trade or business within the meaning of section 117 (a) and (j) of the 1939 Code, we hold that the profits realized from the sale of his property during 1950 and 1951 must be treated as ordinary income, taxable under section 22 (a) of the 1939 Code.[2]

### Issue 2.

Real estate in the State of Michigan is commonly conveyed pursuant to executory contracts of sale which provide for a down payment with

---

[2] SEC. 22. GROSS INCOME.

(a) GENERAL DEFINITION.—"Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *

the balance of the purchase price payable in installments. These contracts are referred to as land contracts. Land contracts are accepted in Michigan as evidence of indebtedness and are freely traded, assigned and pledged, the purchase of such contracts at a discount being a common practice in that State. Upon the purchase of the vendor's interest in a land contract, the buyer acquires all of the rights of the vendor, and the vendee makes payment directly to the purchaser of the contract under the same conditions and terms as were agreed upon by the original parties. Where property is sold under such contracts, the vendor is protected by a right to recover the property in the event of default. Michigan Stat. Ann. (1938 ed.), sec. 27.1986. Under Michigan law, the vendor's interest in such contracts becomes personal property at the time of sale by virtue of the doctrine of equitable conversion.

Petitioner has been purchasing land contracts since the 1920's. In more recent years, he has been able to make a great many such purchases at a favorable rate of discount. Petitioner presently holds about 70 land contracts. Apart from interest income (treated separately by petitioner on the two returns here in issue), the profits derived from the land contract purchases are equal to the excess of the amount realized over the cost of each contract purchased. Therefore, in each instance the profit is equal to the amount of the discount.

Respondent takes the position that the discounts recovered on such land contracts are taxable to petitioner as ordinary income. Petitioner insists that such profits derived from his land contract transactions are properly taxable as long-term capital gains.

Land contracts of the type here in question have been held by the United States Court of Appeals for the Sixth Circuit to be closely analogous in nature to bonds, notes and mortgages. *Commissioner* v. *Hart*, 76 F. 2d 864.

The profits derived by petitioner from such contracts were realized simply by holding the contracts until maturity, meanwhile collecting the periodic payments from the purchaser of the property. Petitioner merely collected the proceeds of assigned claims. None of the profits here in issue resulted from the disposition of a contract. Consequently, there was no "sale or exchange" of a capital asset within the meaning of section 117 (a) (4) of the 1939 Code.[3] It is well settled that gain resulting from the collection of a claim or chose in action is taxable as ordinary income. *Osenbach* v. *Commissioner*, 198 F. 2d 235, affirming 17 T. C. 797; *Cooper* v. *Commissioner*, 197 F. 2d 951.

---

[3] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

\* \* \* \* \* \* \*

(4) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing net income ;

Petitioner appears to be in the same economic position as a bondholder who realizes gain from the recovery of discount on bonds purchased for less than their face amount.

We, therefore, hold that the profits realized by petitioner from the collection of the proceeds of land contracts during 1950 and 1951 are taxable as ordinary income under section 22 (a) of the 1939 Code.

*Decisions will be entered under Rule 50.*