Thomas McHugh and Margaret D. McHugh v. Commissioner.
McHugh v. Commissioner
Docket Nos. 55953, 58822.
United States Tax Court
T.C. Memo 1957-4; 1957 Tax Ct. Memo LEXIS 249; 16 T.C.M. (CCH) 14; T.C.M. (RIA) 57004; January 11, 1957
Arnold W. Lungershausen, Esq., for the petitioners. Robert B. Pierce, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies in the income tax of petitioners and additions to tax under section 294(d)(1)(A) and (d)(2) of the Internal Revenue Code of 1939 for the indicated years as follows: Additions to tax
Docket
Sec.
Sec.
No.
Year
Deficiency
294(d)(1)(A)
294(d)(2)
55953
1951
$ 204.44
$1,819.57
$1,207.60
1952
14,929.44
2,478.37
58822
1953
26,694.80
The issues raised by the pleadings and not disposed of by stipulation are the correctness of the respondent's action (1) in determining that the profits *250 realized by petitioners from the sale and liquidation of land contracts during 1951, 1952 and 1953 were taxable as ordinary income and (2) in determining that for 1951 petitioners are liable for additions to tax under section 294(d)(1) and (d)(2) of the Internal Revenue Code of 1939, and that for 1952 petitioners are liable for an addition to tax under section 294(d)(1) of the Code. An additional issue presented by the pleadings was abandoned by petitioners at the hearing. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners Thomas McHugh and Margaret D. McHugh are husband and wife and filed joint income tax returns for 1951, 1952 and 1953 with the collector at Detroit, Michigan. Issue 1 Thomas McHugh (sometimes hereinafter referred to as petitioner) became employed as a real estate salesman and mortgage broker in 1930. In 1933, he entered the real estate business. In addition to the sale of real estate, he engaged in the purchase and sale of land contracts and the brokering of mortgages in the Detroit area. The land contracts involved herein are executory contracts for the sale of real estate which provide for a down payment with *251 the balance of the purchase price payable in installments. Legal title to the property is retained by the vendor until the consideration is paid in full. Upon the purchase of the vendor's interest in a land contract, the buyer acquires all the rights of the vendor, and the vendee subsequently makes payment directly to the purchaser of the contract under the same conditions and terms as were agreed upon by the original parties. Land contracts are freely assigned in Michigan and the purchase of such contracts at a discount is a common practice. Petitioner has maintained and occupied a suite of offices in the downtown business area of Detroit for approximately 25 years. A sign on petitioner's office door reads a follows: "Thomas McHugh Mortgage Loans, Land Contracts, Real Estate". In addition, the following designation appears on his office door: "Mutual Land Contract and Mortgage Company". Petitioner devotes his full time to his real estate, mortgage and land contract activities. He spends approximately one half of his time working on matters pertaining to mortgages and the balance on land contracts and real estate. During the years in issue, petitioner's income was derived primarily *252 from the rental and sale of real estate, mortgage brokering activities, the collection of principal and interest on land contracts held by him and the purchase and sale of such contracts. In addition, petitioner occasionally purchased improved real estate in need of repair, repaired the property and sold it on land contract. For several years petitioner has employed one or more persons to assist him in his real estate, mortgage and land contract activities. He presently has two employees, but he has had as many as four employees during the years here in issue. Petitioner has held a real estate broker's license for the past 25 years. He is well known in real estate and land contract business circles. During the years in issue, petitioner utilized a business letterhead which consists of the following: "Woodward 1-0348 - 1-0990 "THOMAS McHUGH "Mortgage Loans - Land Contracts - Real Estate "1410 Ford Building "Detroit 26, Michigan" Petitioner advertised frequently for the purchase of land contracts in Detroit newspapers during 1951, 1952 and 1953. He also advertised for the purchase and sale of land contracts in the Detroit Classified Telephone Directory during the years *253 1951 and 1953, and during 1953 he advertised for the purchase and sale of land contracts and real estate in the City Directory and Classified Buyer's Guide of the City of Detroit. The following is a summary of the number of land contracts purchased and sold by petitioner during the years 1950 through 1953: Year
Purchased
Sold
1950
84
46
1951
75
33
1952
60
40
1953
67
53 The foregoing sales were made to 47 different purchasers. Petitioner owned land contracts with principal balances as of the end of each of the years at issue as follows: Number of
Principal
December 31
contracts
balances
1951
200
$ 896,532.82
1952
210
996,296.98
1953
197
1,014,967.80
The following is a summary of totals with respect to land contract purchases and sales occurring during 1951, 1952 and 1953: 1951
1952
1953
Principal balance date of purchase
$201,992.35
$192,328.53
$269,507.06
Original money paid for contract
155,855.31
147,364.00
202,460.60
Collections on principal
25,228.49
25,921.47
46,715.14
Selling price
164,936.94
157,034.02
210,553.19
Total receipts
190,165.43
182,955.49
257,268.33
Difference (or total profit)
34,310.12
35,591.49
54,807.73
*254 At least one sale of a land contract occurred in each month of 1951 and 1953. During 1952, at least one such sales transaction occurred in each month except November and December. Petitioner acquired the foregoing land contracts at discounts ranging from 5 to 30 per cent of the outstanding principal balance. He seldom incurred a loss in the sale of a land contract but normally realized a profit thereon. A ready market for land contracts existed in Michigan during the years in question. Dealers who specialized in the sale of such contracts during the years in question normally experienced a substantial problem in procuring such contracts. Since the sale of such contracts ordinarily presented no problem, petitioner found it unnecessary to employ salesmen. With the exception of the year 1946, petitioner consistently reported the profits from sales of land contracts as ordinary income in the year in which the contracts were sold or the consideration paid. However, in the joint returns filed by petitioners for 1952 and 1953, they reported profits realized from sales of land contracts as capital gain. Opinion Respondent has determined that the proceeds collected by petitioner Thomas *255 McHugh during 1952 and 1953 from the land contracts purchased and held by him and the profits realized on the disposition of such contracts during those years are taxable as ordinary income. Respondent has taken the position that the contracts sold by petitioner during the years in issue were held primarily for sale to customers in the ordinary course of his trade or business. Although no amended return for 1951 or refund claim for that year appears in the record herein, we assume from the petition and briefs that such a claim for 1951 was timely filed since respondent raises no question with respect thereto. Respondent in his statutory notice of deficiency has made no determination concerning the land contracts held and disposed of during 1951, but he determined a deficiency for that year on other grounds. Accordingly, since both parties on brief argue the question whether the land contracts sold by petitioner during 1951 were held by him primarily for sale to customers in the ordinary course of his trade or business, that issue is likewise presented for our decision. Petitioner conceded that the amounts received as proceeds of the land contracts held by him during the years in *256 question are properly taxable as ordinary income but contends that the profits realized upon the sale of such contracts are taxable as longterm capital gains. The issue presented is whether at the time of sale petitioner held each land contract primarily for sale to customers in the ordinary course of his trade or business within the meaning of section 117(a)(1), (j)(1) and (n)(1) of the Internal Revenue Code of 1939. [1]
*257 Although resolution of the foregoing question involves essentially a factual determination, the courts, in applying the aforementioned sections of the 1939 Code, have emphasized the most important considerations to be taken into account in determining whether property at the time of sale was held primarily for sale to customers in the ordinary course of business. Factors to be given the greatest weight in such cases include the purpose of the taxpayer in acquiring the property, the purpose for which the property is held at the time of sale, the frequency, continuity and substantiality of sales, and the extent of sales activity on the part of the seller or his agents in advertising and soliciting purchasers. Dunlap v. Oldham Lumber Company, 178 Fed. (2d) 781; W. T. Thrift, Sr., 15 T.C. 366; Arthur E. Wood, 25 T.C. 468. Thomas McHugh derived income from four principal sources during the years in issue. He purchased, rented and sold real estate. He conducted a mortgage brokerage business. He acquired land contracts at considerable discounts and collected the outstanding principal and interest and, in a substantial number of instances, he sold *258 such land contracts at a profit. During 1951, 1952, and 1953, petitioner purchased a total of 202 land contracts and sold 126. During the period from 1950 through 1953, petitioner sold a total of 172 land contracts to 47 different purchasers. Seventy-five land contracts were purchased during 1951 and 33 were sold. During 1952, petitioner purchased 60 such contracts and sold 40. In 1953, he purchased 67 land contracts and sold 53. At least one sale of a land contract occurred in each month of 1951 and 1953. During 1952, at least one such sales transaction occurred in each month except November and December. For approximately 25 years, including the three years in issue, petitioner has maintained a suite of offices in the downtown business area of Detroit. From the time he began business lie has held himself out as a dealer in land contracts and real estate. Petitioner devotes his entire time to his real estate, land contract and mortgage activities. In addition, petitioner has employed as many as four persons to assist him in these activities during the years in question. He has held a real estate broker's license for 25 years and is well known in real estate and land contract *259 business circles. He has frequently and actively advertised for the purchase and sale of land contracts in Detroit newspapers of wide circulation, as well as in the Detroit Classified Telephone Directory and the City Directory and Buyer's Guide for the City of Detroit. Until 1952, petitioner consistently (with the exception of 1946) reported profits realized from the sale of land contracts and real estate as ordinary income either in the year of sale or in the year in which the purchase price was paid in full. However, in their joint returns for 1952 and 1953 petitioners reported such profits as long-term capital gain. Although petitioner insists that it was his intention to purchase and sell land contracts solely as an investment and that the contracts sold by him were disposed of for the purpose of eliminating questionable and undersirable investments, the record before us clearly establishes that the sales of land contracts occurring during the years here in issue were frequent, consistent, continuous and in substantial volume. Moreover, such sales were actively solicited by petitioner despite the fact that he employed no salesmen. Consequently, petitioner has not shown to our satisfaction *260 that the land contracts disposed of during those years were held for investment purposes. We are satisfied from the evidence herein that petitioner Thomas McHugh had established himself in the business of selling land contracts and that the contracts sold during the years in question were, at the time of sale, held primarily for sale to customers in the ordinary course of that business. Accordingly, we hold that the profits realized from the sale of such contracts during 1951, 1952 and 1953 are taxable to petitioner as ordinary income under section 22(a) of the 1939 Code. [2]
Issue 2 Petitioners *261 did not file declarations of estimated tax for the years 1951 and 1952, nor did they pay any estimated tax for those years. Petitioners filed their joint income tax return for 1951 on January 15, 1952, together with a remittance for $10,003.18, but the balance of the tax disclosed on the return ($10,000) was not paid until March 14, 1952. Opinion Respondent determined that petitioners are liable for additions to tax for 1951 and 1952 under section 294(d)(1)(A) of the 1939 Code because of their failure to file a declaration of estimated tax during those years. Respondent further determined that petitioners are liable for an addition to tax for 1951 under section 294(d)(2) of the Code for substantial underestimation of estimated tax. It is stipulated that petitioners did not file declarations of estimated tax for 1951 and 1952 nor did they pay estimated tax for those years. It is also stipulated that petitioners filed their joint income tax return for 1951 on January 15, 1952, together with a remittance for $10,003.18, but the balance of the tax disclosed on the return ($10,000) was not paid until March 14, 1952. Petitioners have offered no evidence whatever explaining their failure *262 to file declarations of estimated tax for 1951 and 1952. They have therefore failed to show that their failure to file declarations of estimated tax for 1951 and 1952 was due to reasonable cause and we accordingly hold, on the basis of the stipulated facts, that they are liable for additions to tax for those years under section 294(d)(1)(A) of the Code. It is clear that no estimated tax was paid for 1951 and that a substantial amount was due for that year. Section 294(d)(2) of the Code requires the imposition of an addition to tax where an estimated tax was due and unpaid regardless of the reason for the taxpayer's failure to make such payment. H. R. Smith, 20 T.C. 663. Petitioners are therefore liable for an addition to tax under section 294(d)(2) of the Code because of their failure to pay estimated tax due for 1951. Decisions will be entered under Rule 50. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital assets. - The term "capital assets" means property held by taxpayer (whether or not connected with his trade or business), but does not include - (A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business: * * *
(j) Gains and Losses From Involuntary Conversion and From the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of property used in the trade or business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *
(n) Dealers in Securities. - (1) Capital gains. - Gain by a dealer in securities from the sale or exchange of any security shall in no event be considered as gain from the sale or exchange of a capital asset unless - (A) the security was, prior to the expiration of the thirtieth day after the date of its acquisition or after the date of the enactment of the Revenue Act of 1951 (whichever is the later), clearly identified in the dealer's records as a security held for investment; and (B) the security was not, at any time after the expiration of such thirtieth day, held by such dealer primarily for sale to customers in the ordinary course of his trade or business. * * *↩
2. SEC. 22. GROSS INCOME. (a) General Definition. - "Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form paid, or from professions, vocations, trades, business, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *↩