Charles Oran Mensik and Mary Mensik v. Commissioner.Mensik v. CommissionerDocket No. 89410.United States Tax CourtT.C. Memo 1968-8; 1968 Tax Ct. Memo LEXIS 289; 27 T.C.M. (CCH) 28; T.C.M. (RIA) 68008; January 11, 1968. Filed Kinsey T. James, for the petitioners. WITHEYMemorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies in petitioners' income tax for the years 1953, 1954, and 1955, as well as an addition to tax for the year 1955 under section 6654 of the Internal Revenue Code of 1954, 1 as folows: YearDeficiencyAddition to taxSec.6654, I.R.C.19541953$ 38,652.121954378,342.861955335,546.68$1,268.05The sole issue remaining for our determination is whether the gain arising from the sale of petitioners' property during the years in question is taxable as ordinary income or as capital gains. Although petitioner originally raised, as an issue, the correctness of the addition to tax imposed for the year 1955 pursuant to section 6654 of the Code, he has now apparently abandoned the issue in light of his failure to address himself thereto, either at trial or on brief. *291 Inasmuch as additional issues raised by the pleadings have been disposed of by agreement of the parties, a Rule 50 computation will be necessary. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, resided in Oak Park, Illinois, at the time the petition was filed. During the taxable years in question they filed joint Federal income tax returns on a calendar year basis with the district director of internal revenue, Chicago, Illinois. During the years in question, Charles Oran Mensik (hereinafter referred to as petitioner) was president, chairman of the board of directors, and a member of the loan committee of City Savings Association (hereinafter referred to as City Savings), a mutual savings and loan association in Chicago, Illinois, which invested its deposits largely in real estate mortgages. City Savings was founded in 1908 and petitioner had been one of its officers since 1942. During the years in question, petitioner devoted approximately 8 to 10 hours a day, 6 days a week, to his duties at City Savings. In addition, petitioner spent approximately 1 hour a day on his insurance business, City Insurance Agency, *292 and "a couple of hours" a week on his safety deposit business, City Safety Deposit Company. Petitioner also owned the City Currency Exchange, a business which derived its principal income from the sale of money orders and traveler's checks. For many years, including those in question, petitioner held a real estate broker's license and was qualified as a real estate appraiser. This qualification aided petitioner in passing upon valuations in the making of mortgage loans at City Savings. However, during the years in question, petitioner had no interest in any real estate office or brokerage firm, received no real estate commissions, and was not retained by others to negotiate for the purchase or sale of real estate of any kind. On occasion, petitioner used the services of other real estate brokers in connection with his personal real estate purchases and during the years in question he paid total brokerage commissions of $727.41. Petitioner maintained no real estate sales office or sales force, nor did he advertise any real estate holdings for sale either personally or for others. On no occasion did he list a telephone number for the purpose of facilitating the sale of his own properties*293 to prospective purchasers. Melvin Building Corporation (hereinafter sometimes referred to as Melvin) was organized in Illinois in 1945 by Carl M. Melberg, Mary Ann Barto, and Joseph Mensik, petitioner's father. Joseph Mensik originally owned approximately 47 percent of the Melvin stock. From its inception, Melvin was in the business of acquiring land, constructing business buildings, apartment buildings, and houses, and then selling the improved properties. During the years in question, the stockholders of Melvin were Carl Melberg, Mary Ann Barto, Robert Cramer, and Irene Kunitz. Robert Cramer is petitioner's brother-in-law and Irene Kunitz is petitioner's sister. Mary Ann Barto was secretary-treasurer of Melvin during the taxable years and had been associated with petitioner in that she and petitioner had participated in various business ventures and she had acted as his nominee on purchases of real estate. Petitioner, beginning prior to 1953 and extending through and after the years in question, invested in real and personal property in pursuance of a "family investment program" which was originally undertaken for the purpose of producing income in the form of interest, dividends, *294 and rent. During the years in question, petitioner invested principally in three types of investments: stocks and bonds, Cook County, Illinois, delinquent real estate tax certificates, and improved as well as unimproved real estate. Petitioner's primary purpose in purchasing tax certificates was to speculate in the underlying subdivision lots. 2 When the property owner failed to exercise his right of redemption within the statutory period, petitioner ordinarily perfected title to the underlying property with the assistance of a 30 real estate appraiser for the State of Illinois, who checked and otherwise assisted petitioner in perfecting title to such lots (hereinafter referred to as certificate lots), which were then sold to third parties. The following tables illustrate petitioner's activity in the sale of certificates and certificate lots during the years in question: *295 Table ITax CertificatesCertificate Lots SoldAcquiredNo.AcquisitioNo.CostDate ofSale pricen dateofcertificsaleates24-16-481$ 223.366- 3-53$ 700.00198.1012-31-53500.0016- -5115,000.007- -5311,000.0018-14-511751.779- 8-532,000.00109-27-5152,083.377-27-536,000.0052,138.417-29-536,000.00110-24-5111,150.001-29-533,600.00210-29-5121,594.001-29-536,000.00111-27-511644.279- 8-532,000.00112- 1-511428.559- 8-532,000.00112- 4-511212.009- 8-533,200.00212- 8-5121,023.849- 8-534,000.0016- 5-521376.349- 8-531,600.0026-16-521599.797-25-532,000.001428.559- 8-532,000.0018-18-521198.009- 8-532,000.00512-18-5231,829.2412-19-556,000.0021,318.9712-22-557,500.0081-28-5321,886.009- 8-534,500.0065,384.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,000.0013-25-531697.3412-22-552,500.0044-29-531156.368-27-54700.001105.3310-20-54500.001119.5412-13-54479.841164.331-25-55500.0011- 3-541354.4710-30-54900.0012-24-5411,670.6712- 5-542,000.004646$30,636.60$90,179.84*296 Table ITax CertificatesAcquiredNo.1953Gain on1955sale 19542$ 467.64401.9016,000.0011,248.23103,916.633,861.59 12,450.0024,406.0011,355.7311,571.4512,988.0022,976.1611,223.6621,400.211,571.4511,802.005$ 4,170.766,181.0382,614.00$ 4,616.0011,802.664543.64394.67360.30335.671545.531329.3346$40,263.65$ 6,789.47$12,490.12 Table IITax CertificatesTax Certificates SoldAcquiredNo.AcquisitioNo.CostDate ofSale pricen dateofcertificsaleates2212-18-521$ 451.377-28-54$ 112.851517.5911-12-54359.951611.5912- 3-54426.941426.5712- 8-54215.9651,873.3412-14-541,058.71126,1 08.5912-18-545,074.221509.1812-21-54393.15283-25-532583.304-16-54427.7631,176.9311- 9-54801.0942,124.2411-15-541,695.2752,009.5511-24-541,389.3951,976.5512-28-541,998.891479.311-25-55529.771584.312- 1-55699.431316.312-19-55393.171411.312-24-55447.8041,898.243-25-552,149.821385.315-21-55425.5814-28-531164.7811- 9-5456.855151$22,608.37$18,656.60*297 Table IITax CertificatesAcquiredNo.1953Gain (loss) on1955sale 195422$ (338.52)(157.64)(184.65)(210.61)(814.63)(1,034.37)(116.03)28(155.54)(375.84)(428.97)(620.16)22.34$ 50.46115.1276.8636.49251.5840.271(107.93)51[4,522.55)$ 570.78 31 The foregoing 97 tax certificates involved in sales transactions during the years in question, either as certificates or certificate lots, were originally obtained by petitioner at tax sales or by assignment from other purchasers who acquired them at tax sales. The certificates represented lots in the following subdivisions: SubdivisionNo. ofcertificatesShekleton Bros., 2d Addition to Bellwood15Shekleton Bros., 3d Addition to Bellwood38Shekleton Bros., Resubdivision of Paynes Subdivision18School Trustees 110Paynes Addition to Bellwood6Hollywood-Brookfield4Brookfield, 3d Addition to Grossdale3Bellwood "L" Subdivision1Smalley's Subdivision1Westchester Zelosky1Total97*298 In 1953 petitioner constructed the Oak Park Avenue Apartments, consisting of two buildings, each containing six units. Although petitioner built those apartments with the intention of deriving rental income, no rental income from those apartments was reported in petitioner's tax return for the years 1953 or 1954. Both apartments were sold during 1954. On June 17, 1954, petitioner acquired a 10-lot site in the Austin section of Chicago, with the intention of either constructing apartment buildings or selling the land at a profit. At the time those lots were purchased, the existing zoning on that land would have allowed the construction of apartments. However, prior to any actual construction, petitioner decided to sell the Austin lots and buy a 103-acre farm in suburban Westchester. The farm was purchased with the intention of either constructing apartments or selling the land at a profit. The Austin lots were sold to Melvin in March 1955, the proceeds of which were invested in stocks, bonds, and petitioner's savings account at City Savings. Carl Melberg approached petitioner with an offer to purchase the farm for a housing project, but petitioner took no action until approximately*299 May 1955, when the Illinois Supreme Court handed down a decision which had the effect of permitting the establishment of guarantee stock associations in Illinois for the first time. As a result of that decision, as well as a rapid increase in the value of the farm property, petitioner determined to sell the farm and invest a portion of the proceeds in the chartering of two guarantee stock associations. The farm was sold on August 7, 1955, and of the proceeds, $110,000 was invested in First Guarantee Savings Association and the same amount in the Chicago Guarantee Savings Association, resulting in petitioner acquiring more than a 95 percent stock interest in each association. The following table discloses petitioner's activities in the sale of his real estate holdings during the years in question, excluding tax certificates and certificate lots, together with the holding period and gain attributable to each sale: Table on page 32 The sale of three cooperative apartment units for which petitioner reported a gain of $3,830.41, Table III, supra, were sold to three purchasers identified on petitioner's 1955 return as "Keller," "Kunitz", and "Emerson." The apartments designated in*300 the above table as 929 Bellwood and 3509 Jackson were sold to Melvin sometime during 1954. Incident to that transaction, Melvin assumed outstanding first mortgages on those properties totaling $82,724.19 which exceeded petitioner's total adjusted basis of $31,978.75, resulting in a gain of $50,745.44 to petitioner. During the years in question, petitioner's tax returns disclosed net income from rentals as follows: YearSourceAmount19531119543509 Jackson Ave.$2,780.50929 Bellwood3,629.101244 Kedzie Ave.(2,717.00)19551244-46 North Kedzie Ave.(2,893.45) The various sources of petitioner's income during the years 1953 through 1955, together with the percent of total annual income represented by each source, are set forth in the following table: Table IIIProperty soldAcquisitionCostDate of saleHoldingdateperiod (months)Lot (Shek. Payne9-16-52$ 1,140.982-10-53539/2)Lot (Shek. Payne1-23-532,200.002-10-531/232/3)Oak Park Apt.7-27-5392,918.694- 6-549(#1)Oak Park Apt.7-27-5393,146.014-18-549 1/2(#2)929 Bellwood2219542(Apt.)3509 Jackson2219542(Apt.)2d mortgage1950872.271954310 lots 46-17-5440,000.003-26-559 1/2342 S. Oak Park9-14-5428,000.006-15-559(house)661 N. Belleforte8-25-5452,500.006-10-559 1/2(house)1330 E.N.W. Hgh'y7- 1-5411,818.0111- 3-5516(house)1334 E.N.W. Hgh'y7- 1-5412,165.09[4-231014,421.35(house)-553 Co-op Apts12-12-4923,419.59195533 Co-op Apts.12-12-4923,419.5919553(installmentplan)Apt. Contracts 62219552103 Acre Farm11-30-5428- 7-558Total*301 Table IIIGain on saleProperty soldSale price195319541955Lot (Shek. Payne$ 2,500.00$1,203.0239/2)Lot (Shek. Payne2,500.00300.0032/3)Oak Park Apt.118,410.561 $25,491.87(#1)Oak Park Apt.121,042.711 27,896.70(#2)929 Bellwood25,659.93(Apt.)3509 Jackson225,085.51(Apt.)2d mortgage1,341.96469.6910 lots 477,900.00$ 37,900.00342 S. Oak Park38,500.0010,500.00(house)661 N. Belleforte72,000.0019,500.00(house)1330 E.N.W. Hgh'y14,447.232,629.22(house)1334 E.N.W. Hgh'y2,256.26(house)3 Co-op Apts27,250.003,830.413 Co-op Apts.28,250.005 678.18(installmentplan)Apt. Contracts 622,380.82103 Acre Farm2422,936.10$1,503.02$104,603.70$502.610.99*302 33 Table IV19531954SourceAmountPercentAmountof totalReal estate sales (including tax$41,766.6743.01 $107,158.08cer- tificates and secondmortgage)Salaries and director's fee37,431.7638.641,500.00Insurance business2 13,636.9014.020,443.96Security sales(10,062.13)9,246.67Dividends, interest, and other4,271.514.45,055.39in- comeRents and royalties23 3,692.60Total$97,107.84$187,096.50Table IV1955SourcePercentAmountPercentof totalof totalReal estate sales (including tax57.3$515,671.8984.9cer- tificates and secondmortgage)Salaries and director's fee22.240,300.006.6Insurance business10.923,737.293.9Security sales4.94,611.30.8Dividends, interest, and other2.723,111.043.8in- comeRents and royalties2.0(2,893.45)Total$607,431.52*303 During the years in question, petitioner continuously bought and sold stocks listed on the New York Stock Exchange. On October 31, 1955, the balance in petitioner's margin account was $214,515.52, approximately 90 percent of which was purchased during 1955. Opinion The question presented is whether petitioner's gain on the sale of real estate tax certificates, a mortgage, and improved and unimproved real estate, realized in the years 1953 through 1955, was taxable as capital gains or as ordinary income. As to the various kinds of property involved, respondent contends that petitioner held the properties primarily for sale to customers in the ordinary course of his business and therefore the properties were not entitled to capital gains treatment under the relevant provisions of either section 117 of the Internal Revenue Code of 1939 or sections 1221 and 1231 of the 1954 Code. 3*304 The issue for our determination, as framed by the pertinent statutory language, is whether petitioner, during the 3 tax years 34 in question, was in the real estate business selling property "held by * * * [him] primarily for sale to customers in the ordinary course of his trade or business." To prevail, petitioner must carry the burden of proving the negative of this proposition, and in passing on this question we must construe the capital gains provisions narrowly inasmuch as they constitute an exception to the normal tax requirements of the Code. Corn Products Co. v. Commissioner, 350 U.S. 46, 52 (1955). The Supreme Court in Malat v. Riddell, 383 U.S. 569, 572 (1966), held that the word "primarily" as used in section 1221 of the Code means "of first importance" or "principally" and that: The purpose of the statutory provision with which we deal is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand ( Corn Products Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 52) and "the realization of appreciation in value accrued over a substantial period of time" *305 on the other. ( Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 134.) * * * In resolving the capital gains question in cases such as this, a number of criteria have been applied, among which are the purpose for which the property was acquired, held, and sold; the volume, frequency, and substantiality of the sales; the holding period of the property involved; the extent of the sales activity by the seller or his agents in improving the property; and the advertising for and solicitation of purchasers. Paul K. Ashby, 37 T.C. 92, 97 (1961); Arthur E. Wood, 25 T.C. 468 (1955). While all the foregoing criteria have been applied to shed light on the problem and the taxpayer's purpose at the time of purchase has evidentiary weight, we have recognized that "the end question is the purpose of the 'holding' at the time of the sale or sales." S. O. Bynum, 46 T.C. 295, 299 (1966). See also Rollingwood Corp. v. Commissioner, 190 F. 2d 263 (C.A. 9, 1951), affirming a Memorandum Opinion of this Court, and Mauldin v. Commissioner, 195 F. 2d 714 (C.A. 10, 1952). In Bynum, we quoted with*306 approval from Lazarus v. United States, 172 F. Supp. 421 (Ct. Cl. 1959), where that Court stated that: Perhaps the only guiding principle of general application that can be gleaned from the judicial decisions dealing with the problem * * * is that every case * * * must be decided on the basis of its own facts, there being no single test that can be applied to all such cases with decisive results. * * * Involved in this case is the sale of 51 real estate tax certificates, 58 lots, a 103-acre farm, 4 houses, 4 apartment buildings, 6 apartments sold as cooperative units, 12 apartment contracts, and a second mortgage. Petitioner contends as to all these properties that they were sold pursuant to a longrange family investment program which was: directed toward the acquisition of income-producing realty and personalty which could by reason of not only its income yield but also because of appreciation in value over the years could - by prudent liquidation when and if warranted by presented opportunities to make even more promising investments by reinvestment of such available liquidation proceeds - build itself into an income-producing estate capable of providing family*307 support and security down through the years. * * * While it was hoped that the value of the investment properties would increase in time, it was petitioner's stated purpose to invest in income-producing property. As petitioner testified at trial: income. My thinking was to invest in stocks, bonds, and certificates that would give me interest and dividends and in real estate buildings that would produce rent. Although petitioner's investment program bears some resemblance to the kind of investment activities which might ordinarily entitle a taxpayer to capital gains treatment, we must still determine, by a consideration of the numerous purchases and sales of realty and personalty during the years in question, whether petitioner's activities complied with the statutory requirements. In seeking an answer to this question we think it appropriate, under the facts in this case, to consider separately each distinct type of property involved. With regard to petitioner's purchase of real estate tax certificates during the years 1948 through 1954, the Illinois Revenue Act of 1939, as amended, Ill. Ann. Stat. ch. 120 (Smith-Hurd), provided a procedure whereby bidders could come in at public*308 auction and bid on property which was subject to delinquent real estate tax. The bidder who 35 offered to pay the amount due on each lot for the least percentage thereon as penalty, not exceeding 12 percent of the amount of such tax or assessment, became the purchaser, 4 and received a certificate of purchase (hereinafter tax certificate) upon payment of the amount bid. 5 The real property involved was subject to a right of redemption at any time within 2 years from the date of the sale or thereafter until a tax deed was issued, 6 and the person redeeming the property was required to pay the amount for which the property was sold plus an amount in penalties which was dependent upon how soon after sale the redemption occurred. 7 In the event the property was not redeemed within the 2-year period, the holder of the tax certificate could obtain a tax deed which, during the years in question, gave the holder marketable title to the underlying property. 8 Only in the event redemption occurred after the expiration of 2 years from the date of sale was the redeeming party required to pay interest at 6 percent on the face amount of the tax sale, subsequent taxes, and other minor expenses*309 which were paid for by the purchaser of the tax certificate. 9*310 Although petitioner began purchasing real estate tax certificates in April 1948, more than 95 percent of the certificates involved in this case were acquired between June 1951 and April 1953. Petitioner contends that each tax certificate was purchased as an income-producing component of his investment program, and as such was expected to yield an 18 percent annual return. The sole support for this contention is found in petitioner's statement at trial that: "I purchased several [tax certificates] because they paid 6 percent interest and 1 percent penalty per month under the laws of the State of Illinois." Petitioner cites no authority for this penalty-interest formula and our reading of the Illinois Code fails to support such a formula. In fact, the pertinent provision of the Illinois Code for the years in question, Ill. Ann. Stat. ch. 120, sec. 734 (Smith-Hurd), provides for no interest at all to the certificate holder except on those redemptions occurring subsequent to the 2-year statutory period of redemption. The certificate holder, upon redemption, was only entitled to the amount of tax and interest paid for the tax certificate plus a penalty, the amount of which was the*311 penalty successfully bid at the tax sale or a multiple thereof, depending upon when during the 2-year redemption period the property was redeemed. Although the initial penalty could be as high as 12 percent of the delinquent tax assessment, the certificate was awarded to the person who bid the lowest penalty at the tax sale. Thus, the penalty need not be the maximum 12 percent allowed by statute, but might be any amount between zero and 12 percent, depending upon a number of factors, one of which being the bidder's desire to acquire the underlying real estate. In this respect petitioner has failed to show that the penalty bid for even one of the 97 certificates involved would have yielded or did yield an annual return of 18 percent. We are therefore unable to find, with any degree of certainty, that the purchase of certificates was consistent with petitioner's investment program. Of the 97 certificates involved in this case, none were redeemed and 46 were sold to third parties. As to the remaining 51 certificates, petitioner obtained tax deeds subsequent to the statutory period of redemption and thereafter sold the underlying lots. Considering petitioner's knowledge of the Chicago*312 real estate market as a banker, real estate broker, and appraiser, we think it more than coincidental that of the 97 certificates in question, 81, or approximately 83 percent, involved property in only four 36 subdivisions 10 and at least two of those subdivisions, involving 53 certificates, were in Bellwood, Illinois. In addition, another 7 certificates related to subdivision property in Bellwood, 11 lending further weight to the conclusion that many of the certificates, if not all, were acquired in a relatively small geographical area which petitioner felt, from his knowledge of the Chicago real estate market, constituted a good real estate speculation. Petitioner himself testified that during the time when he was acquiring tax certificates, "there were about 500,000 lots in tax delinquency status" in Chicago. The fact that his purchase of certificates was limited to such a small geographical area, although his potential selection was virtually unlimited, is an indication that petitioner's reason for purchasing certificates was not principally for their expected income yield, but rather for the purpose of acquiring property in carefully selected areas. That petitioner's highly*313 selective purchase of tax certificates proved fruitful is beyond question for of the 46 certificate lots which he sold, he realized a gain of over $59,000 on an investment of $31,000, yielding a return of almost 200 percent on certificates, the majority of which were held for less than 2 years. Even if we consider the net loss petitioner sustained upon the sale of 51 certificates, his net gain on the sale of all 97 certificates, either as certificates or as certificate lots, amounted to $55,591.47. Since the total cost of those 97 certificates was only $53,244.97, it is apparent that petitioner still more than doubled his investment within an average holding period of less than 2 years. In addition to the foregoing, we note that petitioner's activity in tax certificates was substantial and of a continuing nature. The record discloses that he purchased the 97 certificates in question on 20 separate dates and sold*314 the property, either as certificates or lots on 37 separate dates, virtually all of which activity took place in a period of less than 3 years and involved an investment of $53,000. In addition to applying his own real estate expertise in the selection and purchase of certificates, petitioner relied on the services of an appraiser for the State of Illinois in perfecting title to certificates not redeemed within the 2-year statutory period. Petitioner contends that he was persuaded to sell his tax certificates and certificate lots because "redemptions were not occurring to the extent anticipated." From a review of the entire record, petitioner's alleged reason for selling the certificates and lots appears to be a gross understatement inasmuch as we find no evidence that any tax certificate owned by petitioner during the 3 years in question was redeemed. While this circumstance, standing alone, is not conclusive proof that petitioner purchased certificates with the intent to resell them when the price was right, rather than to hold them as an income-producing investment, we think such a conclusion becomes compelling in the context of the other facts presented. From a thorough consideration*315 of all the foregoing factors, we think petitioner was in the business of acquiring certificates in order to speculate in the underlying subdivision properties located principally in Bellwood, Illinois, and toward that end petitioner held the certificates and lots primarily for sale to customers. That being the case we must sustain respondent's disallowance of capital gains treatment on the disposition of both certificates and certificate lots sold during the years 1952 through 1955. On February 10, 1953, petitioner sold two unimproved lots for a total gain of $1,503.02. The first lot was purchased for $1,140.98, 5 months before its sale, and the second lot was purchased for $2,200, only 17 days before sale. The gain realized on the lots, $1,203.02 and $300, respectively, was substantial considering the limited holding period in each case. The record fails to disclose facts from which we might determine petitioner's principal purpose in acquiring, holding, or selling those lots, but considering the short holding period involved and the fact that the properties produced no current income, we think it fair to conclude that both lots were purchased as short-term non-income-producing*316 speculations, held primarily for sale to petitioner's customers. We must accordingly sustain respondent's disallowance of capital gains treatment as to each lot. In contending for capital gains treatment on the proceeds of the sales of the 37 remaining properties in this case, petitioner attempts to weave each of the properties into a pattern which he contends is consistent with his family investment program, and ipso facto, entitles him to capital gains treatment. As we indicated, supra, capital gains treatment must ultimately rest on compliance with the statute. However, even assuming, without deciding, that petitioner's investment program would have entitled him to the benefits of the relevant Code provisions, we do not think petitioner carried out his original investment objectives. While that program obviously sought appreciation in property values over the long term, petitioner very clearly indicated at trial, and we have found, that his immediate investment objectives were to be implemented by the purchase of income-producing properties, and in the case of real estate, by the purchase of "buildings that would produce rent." An inquiry into the properties remaining for*317 our consideration convinces us that they were acquired, held, and disposed of in a manner which was consistent neither with petitioner's investment program nor with the capital gains requirements under the 1939 and 1954 Codes. Petitioner contends that the apartment buildings acquired prior to and during 1953 (929 Bellwood, 3509 Jackson, 1423-25 and 1427-29 North Harlem Avenue, and the two Oak Park Avenue apartments), were acquired and held for the purpose of obtaining rental income. In June 1954, petitioner purchased a 10-lot site in the Austin section of Chicago which was zoned for apartment buildings. Petitioner contends that the Austin lots were acquired for the purpose of consolidating his rental properties at one location and pursuant to that objective he supposedly embarked upon a program of liquidating his existing rental properties. 12 In April 1954, the two Oak Park Avenue apartments were sold and sometime during 1954, on a date not disclosed by the record, petitioner sold his apartments in Bellwood, designated in the record as 929 Bellwood and 3509 Jackson. Toward the end of 1954, and prior to actual construction on the Austin site, petitioner decided to consolidate his*318 rental properties in surburban Westchester instead of on the Austin site. Toward that end, he purchased a 103-acre farm in Westchester on November 30, 1954, and sold the Austin site in March 1955. However, as a result of a decision handed down by the Illinois Supreme Court in the spring of 1955, 13 declaring it constitutional for the State to charter guarantee stock companies, petitioner decided to sell his farm in Westchester and invest a portion of the proceeds in the stock of two guarantee stock companies. *319 While petitioner's theory finds some support in the record, that fact alone cannot resolve the ultimate issue. Even if it be conceded that petitioner was prompted by valid business reasons to switch his real estate holdings from apartments to lots in Austin, then to a farm, and finally to sell his farm and acquire charters to two guarantee stock companies, we must still determine whether such continuous and highly profitable switching of properties satisfied the relevant Code provisions. Petitioner testified at trial that the real estate component of his investment program was acquired for the purpose of generating income in the form of rent, yet, of all the properties listed in Table III of our findings, petitioner reported no rental income in his 1953 return, 14 $3,692.60 in 1954, and a loss from rental income of $2,893.45 in 1955. Considering not only the number of real estate properties owned by petitioner during each of the years in question but also the magnitude of petitioner's financial investment in those properties, we must conclude that the production of rental income was never a meaningful purpose of petitioner's investments in the properties sold during the period*320 1953 through 1955. Petitioner, relying upon his intimate familiarity with real estate values in the Chicago area, was able to consistently select properties which evidenced a propensity to rise sharply in value over the short term. The chart below indicates petitioner's holding period and percentage gain from a number of his alleged rental properties sold during the years in question: 38 PropertyHolding% gain forperiod (months)holding periodOak Park Ave apartments9 1/22810 lots in Austin9 1/294342 S. Oak Park9 1/237661 N. Belleforte9371330 E.N.W. Highway16221334 E.N.W. Highway1018With regard to the apartments designated as 929 Bellwood, 3509 Jackson, and the apartment contracts resulting from petitioner's liquidation of the two 6-unit apartments on North Harlem Avenue, the record does not indicate the cost, sales price, or holding period, thereby foreclosing any comparison of those properties in the above context. While the length of the holding period is only one of a number of criteria to be relied on in answering the question before us, we deem it*321 significant that of the properties mentioned above, only one was held for more than 10 months and that one for only 16 months. 15 Where, as here, the holding period is consistently short on property which, though allegedly purchased to produce rental income, produced very little, we think such facts tend to establish a pattern of real estate activity which looks much like "the everyday operation of a business." Corn Products Co. v. Commissioner, supra.While the record fails to disclose either the cost or sale price of the 103-acre farm in Westchester, petitioner's ability to select rapidly appreciating properties is complemented by the sale of the farm whereby*322 petitioner realized a gain of more than $4,100 per acre in only 8 months. Petitioner contends that he decided to consolidate the construction of his apartment buildings in Westchester rather than the Austin section of Chicago because the former location was regarded as a more favorable site "from a long range, value appreciation investment standpoint." The record however fails to substantiate that contention. Petitioner testified only that he wanted to build apartments on the Westchester site because a $100 million expressway was within a mile of the property, a $10 million shopping center was being constructed nearby, a $7 million high school was three blocks away and a Catholic high school was to be built adjacent to the property. Petitioner further contends that he sold the farm in Westchester in order to invest in two guarantee stock companies which allegedly offered him "an even more favorable type of income-producing investment." Again, the record fails to support this contention. Petitioner testified only that when a decision of the Illinois Supreme Court was handed down in the spring of 1955, allowing the chartering of guarantee stock companies in Illinois, he decided to sell*323 the farm and invest a little more than half his gain from the farm's sale in two such stock companies. There is no evidence in the record from which we can fairly conclude that petitioner sold the farm because he thought the chartering of two stock companies constituted a better long-term investment of the type consistent with his income-producing investment program. In this respect, we note that the record is silent as to whether petitioner's investment in the stock companies ever provided the income for which they were supposedly purchased. Contrary to petitioner's contention we think it more probable that petitioner acquired the farm principally because he considered it to be a good short-term speculation for the very reasons he stated at trial. This view is strengthened by the obvious speed and apparent ease with which petitioner sold the farm to his family-related corporation, Melvin. Considering all the facts bearing on the farm property, we conclude that petitioner purchased that property with the principal intention of selling it as soon as he could get the right price which took, in fact, only 8 months and 1 week from the date of purchase. We must accordingly sustain respondent's*324 disallowance of capital gain treatment on the gain arising from the sale of the farm. With respect to the second mortgage sold in 1954, we think it constituted still another manifestation of petitioner's real estate business. Petitioner has failed to show how the selling of this property differed from that of any other property in the case. Consequently, we must conclude that the mortgage was held principally for sale to petitioner's customers in the ordinary course of his real estate business. Petitioner, in contending that the properties under consideration were held as 39 investments only, places strong emphasis on the fact that he had no real estate office, no telephone for the specific purpose of transacting his personal real estate activities, and indulged in no solicitation of customers through any advertising media. While these facts, in an appropriate case, might support the taxpayer's theory for capital gains treatment, they do not have that effect in this case. As we have noted in the past, where a seller's market exists, it is not essential to show the existence of active sales promotion in order to prove that a taxpayer is engaged in the business of selling real*325 estate. Arthur E. Wood, supra; Solly K. Frankenstein, 31 T.C. 431 (1958), affd. 272 F. 2d 135 (C.A. 7, 1959), certiorari denied 362 U.S. 918 (1960). The facts in the instant case reveal that petitioner had possessed a real estate broker's license for many years, including those in question, had developed a high degree of proficiency in appraising real estate values, and was a member of the loan committee of City Savings, in which capacity he necessarily passed upon real estate values before approving mortgage loans. While petitioner's foregoing activities would, without more, put him in daily contact with persons wishing to buy and sell real estate, we think it especially significant that he had strong family ties to the Melvin Corporation, a real estate construction company which, among other things, engaged in the purchase of land for the purpose of erecting residential and commercial buildings. The importance of petitioner's contacts with Melvin is illustrated by the fact that of the total gain derived by petitioner from the sale of real estate during the years in question, amounting to $608,717.71 (excluding tax certificates*326 and resulting lots), at least $511,581.54, or 84 percent, was derived from sales of petitioner's property to Melvin. 16 The foregoing facts compel the conclusion that petitioner's contacts with real estate investors were so adequate he had no need to establish either a separate sales office or extensive promotional activities. As we stated in J. Roland Brady, 25 T.C. 682, 690 (1955), "Advertising is merely a means for finding customers; and where an active market exists and potential customers are known, the employment of conventional methods of advertising may not be essential." Petitioner*327 further contends that his banking responsibilities at City Savings, together with his insurance and safety deposit businesses, were so time-consuming as to preclude his involvement in the business of real estate. Where a taxpayer is able to show that he devotes substantially all of his working hours to his principal business, that fact might tend to indicate his alleged investment program is not a separate business. Where, however, the taxpayer's alleged investment activities are extensive and the gains from the alleged investment program greatly exceed the taxpayer's income from his regular business, the taxpayer's argument loses force. Thus, in the Frankenstein case, supra, even though the taxpayer spent 48 hours a week in his law practice, we held that since his gain from the sale of real estate greatly exceeded his law practice income, that disparity must be accorded significance. Similarly, although we have found in the instant case that petitioner spent approximately 55 to 60 hours a week in his aforementioned businesses, we think it is "selfevident that * * * he nonetheless found time to devote whatever efforts were needed to carry on his real estate activities." Solly K. Frankenstein, supra.*328 Concededly, his real estate activities at City Savings were of a type which would bring petitioner in constant contact with situations and persons useful to his personal real estate activities. In addition, petitioner employed the services of a real estate appraiser to assist him in his purchases. These conveniences placed petitioner in the enviable position of being able to pursue active and extensive real estate purchases and sales within the framework of his other businesses, if not outside them. A comparison of petitioner's income from his banking and insurance businesses 17 with the gain from his real estate sales impressive. In 1953 petitioner's income from the banking and insurance businesses constituted over 50 percent of his total income. In 1954 those sources of income accounted for only 33 percent and by 1955 were down to 10 1/2 percent. On the other hand, petitioner's 40 gain from real estate sales grew from 43 percent of his total income in 1953 to 57 percent in 1954, and ultimately to 85 percent by 1955. In light of the clearly divergent trend lines revealed by these statistics, it is evident that petitioner's real estate sales activities were rapidly becoming petitioner's*329 dominant source of income, exceeding by far his income from his other businesses. While petitioner testified that he purchased many of the properties involved herein with an intent that would appear to be consistent with his investment program, i.e., to derive rental income, we think the facts, as discussed above, refute that intent. However, even if it be conceded that many of the properties were purchased with that intent, the circumstances surrounding the holding and sale of those numerous properties convince us that petitioner's intent changed during the holding period and that sometime prior to their sale petitioner determined to hold the respective properties primarily for sale to his customers whenever the opportunity for making a substantial profit arose. From all the facts in the record, we must hold that petitioner held all the properties in question principally for sale to his customers in the ordinary course of his real estate business. Consequently all gains and losses resulting from the sale of such properties were properly denied capital*330 gains and loss treatment by respondent. Decision will be entered under Rule 50. Footnotes1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩2. While petitioner, at trial and on brief, emphasized that he expected to receive an 18 percent annual return from tax certificate redemptions, we find no evidence in the record which indicates whether or not that flgure reflected a reasonable expectation as to any of the 97 certificates involved in this case.↩1. These 10 lots were identified as numbers 21 through 30 of block 8, in petitioner's return for 1953.↩1. Not indicated on return. See footnote 2 to Table IV, infra.↩2. No information supplied by the record. ↩3. Month of sale not indicated in the record. ↩4. These lots were located in the Austin area of Chicago and at the time of purchase were zoned for apartment buildings. ↩6. Petitioner sold two 6-unit apartment buildings located at 1423-25 and 1427-29 N. Harlem Avenue to the 12 tenants under a 10-year trust agreement whereby each tenant, as purchaser, paid interest, principal, and real estate tax on a first mortgage, petitioner retaining beneficial interest in the trust until all payments were made. The income component of the 1955 installment payments amounted to $2,380.82.↩1. The parties have stipulated that the gain on the Oak Park Apts, exceeded the amount reported by $287.46, resulting in total gain from both apartments in the amount of $53,676.03. ↩5. Stipulated amount. ↩1. Petitioner reported interest income from his second mortgage amounting to $75.09. ↩2. On petitioner's 1953 return, both income from petitioner's insurance business as well as rental income were reported as "Insurance & Investment Income - Net." The parties have stipulated that the total income from both sources was $13,636.90 without segregating the portion thereof attributable to rental income. ↩3. This figure represents net rental income.↩3. I.R.C. 1939SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * * (j) Gains and Losses from Involuntary Conversion and from the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of Property Used in the Trade or Business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * * I.R.C. 1954SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * * SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS. * * * (b) Definition of Property Used in the Trade or Business. - For purposes of this section - (1) General Rule. - The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months and real property used in the trade or business, held for more than 6 months, which is not - * * * (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *↩4. Ill. Ann. Stat. ch. 120, sec. 726 (Smith-Hurd). ↩5. Id., sec. 729. ↩6. Id., sec. 734. ↩7. Section 734 of the Illinois Code provided, in part, as follows: Real property sold under the provisions of this Act may be redeemed at any time before the expiration of two years from the date of sale, by payment in legal money of the United States to the county clerk of the proper county, the amount for which the same was sold, together with the amount of the penalty bid at such sale, if redeemed at any time before the expiration of six months from the date of sale; if between six and twelve months, the amount for which the same was sold, together with twice the amount of the penalty bid; if between twelve and eighteen months, the amount for which the same was sold, together with three times the amount of the penalty bid; if between eighteen months and two years, the amount for which the same was sold, together with four times the amount of the penalty bid at said sale. The person redeeming shall also pay the amount of all taxes and special assessments accruing after such sale with seven (7) per cent penalty thereon, for each year or portion thereof intervening between the time of the payment of the subsequent tax or special assessment and the time of redemption, in all cases where the purchaser at the tax sale, or his assignee, shall pay such subsequent tax or special assessment; * * * ↩8. Id., secs. 744, 747. ↩9. Id., sec. 734.↩10. Designated in petitioner's returns as "Shekleton Bros 2nd Addition to Bellwood," "Shekleton Bros 3rd Addition to Bellwood," "Shekleton Bros Resubdivision of Paynes Subdiv.," and "School Trustees." ↩11. Paynes Addition to Bellwood and Bellwood "I." Subdivision.↩12. The record reveals an apparent inconsistency between petitioner's alleged plan of consolidating his rental properties in Austin and his actual real estate activities at that time. Whereas the lots in Austin were purchased in June 1954, petitioner, contrary to his suggested theory, did not embark on a general liquidation program of his rental properties. While selling four apartments in 1954, he continued to purchase improved properties for several months after his consolidation plan had been adopted, purchasing four houses at a total cost of $104,483.10 from July through September 1954. ↩13. While no citation to the alleged Illinois Supreme Court case has been supplied this Court, respondent does not question the existence of such a decision.↩14. See footnote 2 to Table IV in our Findings of Fact.↩15. As to the properties designated in Table III of our findings as "3 Co-op Apts." and "3 Co-op Apts. (installment plan)," while they were held for more than 5 years prior to sale, we find no evidence in the record that petitioner derived rental income from those sources during the years in question. Thus, as with most of the other properties in Table III, there is a complete lack of evidence to show that the holding of those properties was consistent with petitioner's income-producing investment program.↩16. While absolute verification is lacking in the record, we think it more than coincidental that petitioner's tax return for 1955 indicates that with respect to the sale of three cooperative apartments which resulted in a gain of $3,830.41, the names of two of the three purchasers were the same as the last names of petitioner's sister, a stockholder in Melvin, and petitioner's title searcher, further indicating the apparent ease with which petitioner was able to dispose of his property without the need for maintaining either a sales organization or a formal advertising program.↩17. The record is silent as to income derived by petitioner from his safety deposit box business during the years in question.↩