Thomas E. ROBERTSON, Jr., As Trustee of the Farmer's Co-op of Arkansas and Oklahoma, Inc.; Bob Reves; Frances Graham; Robert H. Gibbs, Individually; Robert H. Gibbs, as natural guardian of his minor children, Thomas A. Gibbs and Robert H. Gibbs, Jr.; and Robert H. Gibbs, as Trustee of the Muskogee Internal Medicine Group Profit Sharing Funds; and Bob Reves; Frances Graham; and Robert H. Gibbs as Class and Subclass Representatives, Plaintiffs,

v.

Jack E. WHITE; J.E.W., Inc.; Valley Feeds, Inc.; Gene Kuykendall and Fred Kuykendall, individually and d/b/a Kuykendall & Kuykendall, a partnership; Oran Moody, Jr. and Michael O. Moody, individually and d/b/a Moody and Moody, a partnership; Arthur Young & Company; Harry C. Erwin; Billy Joe Cabaniss, Jr.; Joseph F. Drozal, Jr.; Charles M. Hanson; Hal Brewer; Truman O. Boatright; Hugh Winfrey, Jr.; M.V. Creech; Charles Bane; E.H. Pritchett, Jr.; Robert Plunkett; Ralph McClure; Jimmy Don Gooch; Jerry Metzger; W.J. Rimmer; Don Sebo; Joe Wayne Harris; James Willis; Dan Ray Core; Harold Davis; Jay Freeman; Jay Neal, Jr.; George Wagnon; Raymond (Jack) Clark; Carl Creekmore and Morril H. Harriman, Jr., individually and d/b/a Creekmore & Harriman, a partnership; E.J. Ball, Kenneth R. Mourton, and Stephen E. Adams, individually and d/b/a Ball, Mourton & Adams, a partnership; Kirit Goradia; Eddie Joe Smith; and John Does 1–20, Defendants.

Nos. 85–2044, 85–2096, 85–2155 and 85–2259.

United States District Court, W.D. Arkansas, Fort Smith Division.

May 16, 1986.

Gary M. Elden, Daniel A. Edelman, Kevin Waite, Reuben & Proctor, Chicago, Ill.,

for plaintiff Thomas E. Robertson, Jr., As Trustee of the Farmer's Co-op of Arkansas and Oklahoma.

Robert R. Cloar, Fort Smith, Ark., for intervening plaintiffs Bob Reves, Frances Graham, Robert H. Gibbs, as Natural Guardian of His Minor Children, Thomas A. Gibbs and Robert H. Gibbs, Jr., and Robert H. Gibbs, as Trustee of the Muskogee Internal Medicine Group Profit Sharing Funds; and Bob Reves, Frances Graham; and Robert H. Gibbs as Class and Subclass Representatives.

Carl Liggio, John Matson, New York City, for Arthur Young & Co., Harry C. Erwin, Billy Joe Cabaniss, Jr., Joseph F. Drozal, Jr., Charles M. Hanson.

James M. Roy, Jr., Roy & Lambert, Springdale, Ark., Michael H. Mashburn, Fayetteville, Ark., for Arthur Young & Co.

Fred H. Harrison, University of Arkansas, Little Rock, Ark., for W.J. Rimmer.

Fines F. Batchelor, Jr., Van Buren, Ark., for Truman O. Boatright, Hugh Winfrey, Jr., Jimmy Don Gooch, Ralph McClure, Joe Wayne Harris, James Willis, Dan Ray Core, Harold Davis, Jay Freeman.

Carl Creekmore, Morril H. Harriman, Jr., Van Buren, Ark., for Carl Creekmore and Morril H. Harriman, Jr., Ind. and d/b/a Creekmore & Harriman, a partnership.

Jerry Lee Canfield, Daily, West, Core, Coffman & Canfield, Fort Smith, Ark., for Citizens Bank & Trust Co.

Robert L. Jones, III, Jones, Gilbreath, Jackson & Moll, Fort Smith, Ark., for Gene Kuykendall and Fred Kuykendall, Ind. and d/b/a Kuykendall & Kuykendall, a partnership.

Thomas B. Pryor, Pryor, Robinson and Barry, Fort Smith, Ark., for Oran Moody, Jr. and Michael O. Moody, Ind. and d/b/a Moody and Moody, a partnership.

Eddie N. Christian, Christian & Beland, Fort Smith, Ark., for Jack E. White, J.E.W., Inc., Valley Feeds, Inc.

Jim Jones, Sallisaw, Okl., for M.V. Creech, Charles Bane, Jerry Metzger.

Jerry D. Pruitt, Pruitt & Hodnett, Fort Smith, Ark., for Hal Brewer, Don Sebo, E.H. Pritchett, Jr.

Kenneth R. Mourton, Ball, Mourton and Adams, Fayetteville, Ark., for Ball, Mourton & Adams, a partnership.

Mark A. Grober, Sandlin, Payne & Grober, Muskogee, Okl., for Robert Plunkett.

S. Walton Maurras, Harper, Young, Smith & Maurras, Fort Smith, Ark., for George Wagnon, Raymond (Jack) Clark, Eddie Joe Smith, Waldo Price, J.O. McClure.

Ronald D. Harrison, Harrison and Hewett, Fort Smith, Ark., for Kirit Goradia.

James B. Blair, Springdale, Ark., for E.J. Ball, Kenneth R. Mourton and Stephen E. Adams, Ind. and d/b/a Ball, Mourton & Adams.

James A. Arnold, II, Shaw, Ledbetter, Hornberger, Cogbill & Arnold, Fort Smith, Ark., for Jay Neal, Jr.

Gary D. Corum, Wilson, Engstrom, Corum & Dudley, Little Rock, Ark., for Harry Erwin.

E.E. Maglothin, Jr., Putman & Maglothin, Fayetteville, Ark., for Ball, Mourton & Adams.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

On April 8, 1986, fourteen months after the trustee of the Farmers Co-op filed his initial complaint, and six months before trial, he moved for leave to file a third amended complaint, adding negligence and malpractice claims against employee, attorney and accountant defendants, to go along with the twelve other causes of action aggregately alleged against the thirty-six defendants named in his previous complaint. The trustee's contention is that the professional advisers committed malpractice by failing to direct the Co-op to file a consolidated tax return with its subsidiary White Flame Fuels for the 1980 tax year. The court has undertaken an extensive review of materials in the file, as well as the thorough briefs and arguments advanced

by counsel, and has determined that plaintiff has proceeded with undue delay in bringing his motion, that the addition of the claim would be unlikely of success, that the claim would unduly confuse the issues in this case, and that the plaintiff's request lacks equity. Accordingly, the court denies the motion.

The court believes that denial of this motion is proper even in light of Federal Rules of Civil Procedure, Rule 15(a), which asserts that such leave to amend should be freely given when justice so requires. In *Friedman v. Transamerica Corp.*, 5 F.R.D. 115, 116 (D.Del.1946), the court observed: "The word 'freely' was used with deliberate intention to obviate technical restrictions on amendments ... But this does not mean that leave to amend is to be granted without limit; otherwise the right to amend would be absolute and not rest in the discretion of the court." In *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the Supreme Court construed Rule 15(a) in now-familiar language saying:

> If the underlying facts or circumstances ... may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance, futility of the amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Id.* at 182, 83 S.Ct. at 230. *Foman* presumes that leave be granted, subject to limitations imposed by circumstance, such as undue delay. The court perceives that *Foman's* limitations are illustrative rather than exclusive. Nevertheless, certain of them are pertinent to our case, notably "undue delay" and "futility."

## A. Undue Delay

Plaintiff waited until he had examined every defendant orally before moving to file an amended complaint. He delayed filing his motion for more than a month after he became "actually aware" of his alleged cause of action. He waited, in short, until after all defendants had submitted their interrogatories (the last of which, we understand, were submitted on March 16, 1986) to expose his new theory. In the circumstances of this case, where the court has imposed a structured discovery schedule to bring this matter expeditiously to trial, plaintiff's delay was undue.

The court feels strongly that the plaintiff "could have" discovered this cause of action in March, 1985, and certainly by September, 1985, when he filed his third, "consolidated complaint." (Consolidated with a class of Co-op investors bringing personal actions to recover moneys lost as a result of many of the same transactions.) Assuming that the complexity of this case detracted from plaintiff's acuity in discovering additional theories of recovery, the record supports a finding that the plaintiff actually uncovered this theory (a) before the passage of the extended statute of limitations for bankruptcy trustees, and (b) before the defendants submitted their interrogatories. One infers that the plaintiff chose not to expose his new theory for four to six weeks in order to discover information from unwitting defendants and thereby "get the most" from depositions; secondarily, by waiting to unveil his new theory until after defendants propounded their interrogatories, the plaintiff exploited the discovery schedule in order to "give the least." Other reasons suggest themselves, but not so forcibly as these.

As the court understands matters, the plaintiff needs to show the following to prevail on his latest claim: (1) that the Farmers Co-op owns a subsidiary called White Flame Fuels, but that for the 1980 tax year, and for years following, the two entities filed separate tax returns; (2) that if the Farmers Co-op became a legal or equitable owner of White Flame Fuels *before* it went into gasohol production, then the Co-op could have filed a consolidated return and claimed White Flame's invest-

ment tax credits; and (3) that if the two firms had filed consolidated returns in 1980, the Co-op would have saved nearly a million dollars. Of course, the trustee would have to show that the defendants' failure was malpractice, but that is beside the point. For purposes of this opinion, malpractice will be assumed, as well as proximate causation and the absence of any defenses.

Thomas Robertson became Co-op trustee in October, 1984, eight months after it filed a Chapter XI reorganization. He came into possession of the Co-op's and White Flame's returns for the 1980 tax year, and for years following. These returns were clearly separate. Anyone could see that. The first leg of the tripod sustaining the conclusion that the trustee "could have" discovered this claim earlier is firmly in place. Amid all the charges of fraudulent concealment in this case, there is no suggestion that defendants hid from the plaintiff the fact that separate returns were filed for the Co-op and for White Flame.

The plaintiff's consolidated complaint shows that as of September, 1985, the trustee knew that certain defendants took the position that the Co-op became at least an equitable owner of the White Flame Gasohol plant on February 15, 1980 [Consolidated Complaint, ¶ 42]. The Co-op minutes show that the board voted to purchase the plant in November, 1980, and that the transaction was perfected by means of a "friendly lawsuit" in December, 1980, in which the Crawford County Chancery Court declared that the Co-op was equitably entitled to a transfer of White Flame stock "as of" February 15. The plaintiff has always had a copy of the chancery court decree, and was certainly aware when he filed the consolidated complaint, that an argument could be made, and apparently was to be made, that the Co-op bought White Flame on February 15, 1980.

In addition, the plaintiff knew or should have known that White Flame went into production *after* February 15. Plaintiff admits that his initial impression was that White Flame went into production in Octo-

ber, 1980. This impression was garnered from the accounting treatment given the plant by Kuykendall and Moody [Plaintiff's Reply Memo, April 27, 1986, at 30]. The consolidated complaint evinces a familiarity with White Flame operations, alleging that it only attained a 25% production capacity [Consolidated Complaint ¶ 31]. The trustee had White Flame's records and could have determined its startup date. The Co-op's minutes of February 15, 1980, reflect that Jack White said that the plant would go into production in the future. Information showing that the gasohol plant started production after February 15, 1980, was available to the trustee before he filed a consolidated complaint. Since discovery, the plaintiff has grown more certain that the plant went into production in · March or April, 1980 [Reply Memo., at 31] as opposed to October as he initially believed. Both dates follow February 15. There is no suggestion that the plaintiff ever thought production preceded February 15. In fact, he though it was much later. The second leg of the tripod is in place: there is no question but that by the time the trustee filed the consolidated complaint, he was aware that defendants took the position that the Co-op owned the plant before it went into production.

Finally, plaintiff charged that the transfer of White Flame was "backdated." Over a year ago, the trustee deposed Co-op directors as to why the board voted to file the "friendly lawsuit." T.O. Boatright, a director, told the trustee on March 28, 1985, that the reason for the lawsuit was to capture certain "tax benefits" for the Co-op. [Boatright Deposition, at 23]. Knowing that tax benefits were alleged to be the reason for the suit, the trustee could have inquired whether any tax benefits were taken and if any were missed. This would apparently be an obvious sort of inquiry. As plaintiff himself described it: "[Moody] simply overlooked what is on every accountant's check list, get the printed check list from Prentiss Hall, I think, and it says if you've acquired a subsidiary during the prior year consider whether you ought to consolidate. He doesn't have a check list

or overlooked it, didn't ask this basic question, that's Moody's problem." [Plaintiff's Argument on Motion, April 8, 1986, at 35]. That inquiry was open for plaintiff's counsel to make, as well, and much sooner than he did.

Plaintiff was aware that his two-year grace period extending statutes of limitation for the Co-op was set to end February 24, 1986. Beginning January 27, 1986, plaintiff began deposing Jack White, the Co-op's general manager, and alleged principal actor in a series of frauds purportedly worked against the Co-op and its investors. Through him, plaintiff learned that the tax benefits alluded to by Boatright nearly a year ago were "investment tax credits" [White Deposition at 1982–90]. The time was certainly ripe for plaintiff to research the availability of those credits to the Co-op. There can be no question but that the plaintiff became actually aware of his cause of action in February, 1986. In plaintiff's words:

> After some research, the tax lawyers gave advice on the various issues raised ... and then posed a question which came as a complete surprise to the trustee and plaintiff's counsel: had the defendants ever tried to obtain the "tax benefits" described by White in his deposition?

We are not given a date for this communication, only that it occurred in February [Reply Memo., at 18] It is inferable that it occurred the week of February 10, while there was a one-week break in the depositions, while counsel was back at his office and able to consult with his tax partners. Presumably, at some point two weeks before the trustee's grace period was bound to expire, he became actually aware of the cause of action.

The court is unable to understand why the question posed by the tax lawyers, called a "check list" inquiry, was as novel as the plaintiff claims. It suggests itself plainly. It appears on balance that plaintiff was actually aware of his claim before the period of limitations passed. There is no excuse for failing to file sooner.

Simply because a party has "no good excuse" for filing sooner, authorities suggest, is no reason for finding his delay to be undue. We do not in fact so hold under this analysis. Our finding that delay is undue is made for the following reasons, *inter alia:*

(a) The failure to file sooner introduces new issues, primarily limitations issues, and questions whether the complaint should "relate back" under Fed.R.Civ.P. Rule 15(c), which needlessly burden the court and the parties. The plaintiff admits that with respect to certain defendants, these arguments are weighty and forcible [Reply Memo. at 44]. Plaintiff had it within his power to file his motion before February 24, 1986, and obviate the need for the extensive briefing these questions alone have occasioned. He chose to wait an artificially delayed period coinciding with the timing of his answers to interrogatories so that he could reap all the advantages of "sandbagging" defendants during depositions while effectively thwarting written discovery on this point. The defendants have therefore entailed the expense of paying their lawyers to brief issues which never would have arisen had the plaintiff acted promptly. At the very least, this is discourteous. It constitutes undue delay.

(b) Plaintiff was aware before February 24, 1986, that trial was set for October 20, 1986. Suggestions have been made by defense counsel on the record, and no doubt privately, that this "early" a setting is "a bear." The court does not pretend that it is an easy task to bring (at last count) twenty-seven lawyers and forty-two parties to trial within nine months of the beginning of "merit discovery." The court would have thought that, generally speaking, early trials favor plaintiffs rather than defendants. We have heard, and believe, that Time is the best defense lawyer. As

this is the case, the court might have expected plaintiff to favor it and the parties by jettisoning marginal causes of action, and releasing marginal defendants, as he indicated he might do in his February 27 letter to court and counsel. This was not done; no matter. What the court did *not* expect was that plaintiff would time his motions not only to add another cause of action, but to create two or three additional issues to be resolved which would otherwise be unnecessary of resolution if he would have filed his request promptly.

(c) The court believes that the delay was undue because certain parties at least had filed their interrogatories after February 24, 1986. As plaintiff relates: " ... several defendants took until March to get their interrogatories on file." [Reply Memo. at 28]. As the court understands matters, the last set of defendants' interrogatories was filed March 16, 1986. These parties presumably will have to file extra discovery, at extra cost, and are therefore prejudiced in that respect.

(d) The court evaluated the complaint and the file and chose the October 20 trial date based upon its perception of what the issues raised to that point would require in terms of discovery. The court does not believe that "justice requires" it to travail the defendants further, especially when the cause of action "could have" and actually was discovered earlier by a party who used delay to gain a tactical advantage.

### B. Futility Of The Claim

*Foman v. Davis, supra,* advises trial courts to deny a party leave to amend his complaint if the amendment would be "futile." Most cases suggest that the court should examine the amendment to determine whether it passes a Rule 12(b)(6) test: if it does not, it would be futile to permit an amendment. For obvious reasons, courts have not undertaken a Rule 56 assessment of a proposed amendment although under a futility analysis nothing could be more feckless than to permit an action to go to trial which discovery has shown to be virtually denuded of factual support. In *Dyer v. Eastern Trust and Banking Co.*, 336 F.Supp. 890, 901–02 n. 17 (N.D.Me.1971) (Gignoux, J.), the district court did in fact (albeit *sub rosa*) make a functional determination that the plaintiff could not prove the charges made in her amended complaint, and prohibited her leave to amend a claim to rescind her purchase of unregistered securities. The *Dyer* court determined that even though the amended complaint alleged that the defendants "knew" that they were selling unregistered securities, they told the plaintiff that the securities did not have to be registered, and therefore fraudulently concealed from her a blue sky action she held against them. The trial court determined that even though fraud was alleged, plaintiff's discovery to that point, indeed her entire theory of the case, showed nothing more than that everyone had made a negligent assay of Maine's securities law. It "pierced the pleadings" in making its decision and declined her motion to amend her suit to allege fraudulent concealment. Her action was therefore barred by limitations.

■ It is unwise to read *Dyer* too broadly, and we don't. Decisions to permit amendments must be made on a case-by-case basis. Any assessment of "futility" must be made also on a case-by-case basis, and not solely with reference to a totemic standard such as one which only tests the legal sufficiency of the proffered amendment. This court believes that if the rules are to be applied and interpreted to secure the "just, speedy and efficient" resolution of disputes, Fed.R.Civ.P. Rule 1, then the court must at times analyze questions functionally, not in a vacuum. This means that the court must scrutinize an alleged one-million-dollar lawsuit which plaintiff claims it "just backed into" [Oral Argument at 36]. It needs to weigh the time, cost and burden to the parties of permitting it to

proceed to trial. Where it appears peradventure that the claimant will lose his claim because it is factually unsupported, and because claimant himself will be actively fighting to prove facts directly contrary to those he will need to show to prevail upon it, the court ought to have the discretion to deny the claim under any kind of reasonable "futility" analysis. The claimant can always file a separate action. A decision that a claim is "futile" for purposes of Fed.R.Civ.P. Rule 15(a) is not a judgment such as would estop him from bringing the suit again. The court is strongly convinced, however, that the plaintiff himself believes this cause of action to be futile. He has behaved towards it as he would a stepchild. He has given it no cloak against the winds of defendants' limitations pleas, which he himself has conceded are not hot air. Indeed, he has admitted that his claim is probably baseless.

The central fact plaintiff must prove under his malpractice claim is that the Co-op actually acquired White Flame in February, 1980, before the gasohol plant went into production. In addressing his argument to the court, the plaintiff admitted that he "now believe(s) that the evidence *on balance* shows that the plant was not purchased in February, 1980...." (Reply Memo. at 30). The February 15 date has been described by plaintiff as "backdated," "fraudulent," and a "fraud on the [Chancery] court." Allegations of fraud must be proved by "clear and convincing evidence" in Arkansas, as we have had occasion to relate. We therefore apprehend that the "balance" of evidence to which plaintiff refers in his statement is weighted heavily against the proposition that the transfer was actually made in February, 1980.

Let us suppose that one of two things had happened in this case: either that the Co-op filed consolidated returns and the IRS (which closely audited Co-op returns anyway) challenged the filing, or the Co-op realized its "error" and filed for a refund. Either hypothesis puts the availability or legality of the transferred credits into issue. In either circumstance, the taxpayer has the burden of proof on the propriety of

his consolidation. *Ehlers v. Vinal,* 382 F.2d 58 (8th Cir.1967). The Co-op would have the burden of proving that it had actually acquired White Flame as of February 15, 1980, and that White Flame went into production thereafter.

Is it reasonable to suppose that the Co-op could have prevailed on this contention when its corporate minutes declared that it voted to purchase the plant in November, 1980? Is it reasonable to suppose that it could have sustained its burden when its February 15, 1980, minutes are completely silent on the subject of buying a $4–5 million plant, an enormous investment in the context of the Co-op's operations? Is it reasonable to suppose that it could have met its burden against the government when the government, *per* the Department of Energy, Farmers Home Administration, *etc.,* has countless sworn affidavits by the Co-op's General Manager stating that he himself owned 100% of the gasohol plant? [Reply Memo. at 10]. The plaintiff admitted that the credibility factor of such a position is bottomed on the declarations of White and Brewer against nearly everybody who was at the February, 1980, meeting. [Transcript of Argument, April 8, 1986, at 32]. The only testimony supporting such a claim, the plaintiff suggests, comes from White, Brewer and Mourton. However, Mourton appears only to repeat what he had *heard* from White and Brewer. [Reply Memo., at 18–22].

The plaintiff nevertheless urges that "justice requires" that he be allowed to amend his complaint to assert a claim he doesn't believe in, in order to recover moneys he suggests the Co-op undoubtedly owed to the IRS, and which the Co-op could only recover from the IRS (on timely suit) by ratifying what he claims is a fraud.

This is not to gainsay a claimant's undoubted right to assert inconsistent claims, and to submit them to a jury, subject to Rule 11. *See* Fed.R.Civ.P. Rule 8(d). An amendment may be granted where the cause of action so asserted is not "frivolous" or "futile." *Foman v. Davis, su-*

*pra.* Nevertheless, there ought to be some bare, irreducible showing of factual merit in order to allow an amendment totally at variance with a party's core claims, and which, in fact, can only succeed where the core claim utterly fails. The plaintiff in this instance has admitted that on balance it appears as if his claim is meritless. Does justice require, let alone permit, selected defendants to be put to the expense of defending a million dollar claim which the plaintiff says he "backed into" on the say-so of White and Brewer, persons whom plaintiff has characterized as totally unreliable, whom they allege have admitted to a series of "hair-raising felonies" involving multiple misrepresentations contained in affidavits? [Letter of counsel to court, Feb. 27, 1986, at 2].

In these circumstances, the court believes that it would be an abuse of discretion to permit the amendment. Fed.R. Civ.P. Rule 1 states that the Federal Rules are to be construed so as to effectuate the speedy, just and economical resolution of claims. It is clear that the addition of this claim will prolong the trial, and make it more costly for all the parties, with no benefit to anyone. We have already determined that plaintiff delayed bringing his claim unduly. He has done so, under this analysis, for no good reason. The court suggests by this analysis that leave would have been properly denied if the plaintiff had moved to do so before the February 24, 1986, expiration of the trustee's grace period. That he waited beyond this point, creating issues needlessly, only makes the decision easier.

### C. Confusion Of Issues

■ The court is also impressed by the extent to which adding this claim will confuse the issues against such defendants as Moody. Shucking down the corn, as we say, the Co-op's and the class's core claim against Moody sounds in fraud. The trustee has a claim for negligence concerning the 1980 audit, which may be time-barred unless fraud or fraudulent concealment can be shown. The class's claim sounds exclusively in "fraud," or "gross negligence

which amounts to fraud." This latter formulation will have to be *carefully* explained to the jury so that it does not find fraud from *mere* negligence. The court is very concerned that undue confusion will result if, in the same charge to the jury, an alternative and contradictory claim on negligence against Moody is laid. This concern applies, as well, to the other attorneys and accountants who may owe fiduciary duties to the Co-op. The court believes that precise findings are needed in this action, and believes that the jury's attention should be focused so as to make them. The court is disinclined to permit this focus to be diffused by the tardy introduction of a claim of admittedly dubious merit.

### D. The Equities

■ In any consideration of the equities in this issue, the defendants have all the best of the argument. The sole equity, if one wants to call it that, that the plaintiff has advanced is that if he had been allowed to commence discovery in this case when *he* wanted to, it would have discovered this alternative theory sooner, and could have timely filed it. Of course, we are dealing with a class action here. Court rules require us to deal with standing issues, representation issues, and other class issues first. It should not have been surprising to the plaintiff that class discovery and litigation would precede merit discovery. The court does not recall that the plaintiff ever suggested, for example, that the class case be severed from the Co-op case so that the Co-op could more easily and expeditiously collect its smaller causes of action like the return of director compensation, and perhaps ones which might appear during discovery such as this tax question. In fact, in September, 1985, the Co-op and the class consolidated their actions. In any event, that is of no consequence. The court would probably have consolidated the suits anyway. The point is: case management sometimes dictates that discovery proceed sequentially on certain issues. Case management always dictates that a given party not get his way all the time. That certain discovery issues were not handled

just the way a claimant would have liked is no reason to permit him to raise stale and hypothetical claims later down the line for "tactical" rather than substantial reasons. In short, the plaintiff's motion is without equity.

An order denying the plaintiff's motion to amend his complaint shall be entered contemporaneously herewith.